CONSOLIDATED GAS CO. OF NEW YORK v. NEWTON, Atty. Gen., et al.

(District Court, S. D. New York. August 4, 1920. Supplemental Opinion, August 11, 1920.)

1. Gas ⬤━14(1)—Statutory rate confiscatory; length of test.

A computation of the cost to a gas company of producing and distributing gas, covering a period of 20 months, showing that at the statutory rate the net earnings of the company were not more than 3¼ per cent. per year on the value of the property employed, followed by a period of nearly a year in which the price of labor and materials entering into the production had not decreased, *held* a sufficient test to authorize the court to find that the rate is insufficient to afford a reasonable return, and to enjoin enforcement of the statute until it may be shown that changed conditions warrant its restoration.

2. Gas ⬤━14(1)—Enhanced value of plant to be considered in fixing reasonable rate.

In computing the value of the "rate base" of a gas company, on which it is entitled to earn a fair return, the enhanced value of its permanent property, as land, plant, and machinery, due to existing conditions more or less permanent, which would increase the cost of reproduction, should be allowed.

3. Gas ⬤━14(1)—Depreciation of plant as element in computing rate base.

Depreciation of plant *held* not a factor in computing the rate base of a gas company, where the cost of reproducing a plant of the same capacity is adopted as the valuation; but excessive cost of future renewals over what it would be if the plant were new must be borne by usual profits.

3½. Gas ⬤━14(1)—Depreciation affects rate base, computed from original costs, only if it affects capacity.

Where the rate base is computed from the original cost of a gas plant, depreciation should be deducted from the original cost in arriving at the cost of a present plant of equal capacity, in so far as it is reflected in a loss of capacity, with an allowance for past renewals to offset past depreciation; but if the capacity has remained the same, depreciation should not be a function of the rate base.

4. Gas ⬤━14(1)—Right of company to capitalize franchise.

Where the Legislature of a state, in authorizing the consolidation of gas companies, recognized their right to capitalize the value of their franchises, such right *held* not lost because the franchises were subject to the consent of the municipal authorities to open the streets, and the period had expired within which any new mains could be laid in streets already overcrowded.

5. Evidence ⬤━354(18)—Books of gas company admissible against state authorities.

Books of a gas company, long recognized by statute as a public service corporation, and made subject to regulation of a commission, which has power to supervise and prescribe the form of its records and books, *held* admissible in a suit between the company and the state authorities.

6. Gas ⬤━14(1)—Violation of contract as bar to equitable relief against confiscatory rate.

A gas company *held* not barred from relief in equity against confiscatory rates imposed by the state, because at times in the past its gas was

slightly below the legal standard, as shown by tests made by the city, but not by its own tests, which were reported daily to the city, and to which no objection was made, and where the variation was not substantial.

**7. Gas ☞14 (1)—Sale promotion department as item of cost of distribution.**

The cost of a department of a gas company for promotion of the sale of gas and gas-using machines and appliances *held* a legitimate item of expense of distribution.

**8. Gas ☞14 (1)—Benefits and pensions to employés as items of cost of production.**

Items of expense incurred by a gas company, such as furnishing automobiles for use of its officers, payment of benefits to sick or disabled employés, and pensions to superannuated employés, *held* prima facie a legitimate part of the cost of production, and within the discretion of its officers.

**9. Gas ☞14 (1)—Interest paid on deposits of consumers not allowable as item of cost of distribution.**

Interest paid by a gas company on deposits of consumers *held* not a proper item to be charged to cost of distribution.

**10. Gas ☞14 (1)—Court may make decree enjoining confiscatory rate conditional.**

While a court is without power to fix gas rates, its power to grant an injunction is discretionary, and in enjoining enforcement of a statutory rate as confiscatory it may make its decree conditional, and where the State Public Service Commission has no power to fix a rate greater than the one enjoined, it may require the company temporarily to charge no more than a fixed rate, and impound the excess above the statutory rate to await action of the Legislature, the rate fixed pursuant to such action to relate back to the date of the decree.

**11. Equity ☞410 (7)—Rulings not required on each exception to master's advisory report.**

In a suit to enjoin enforcement of a statute fixing a gas rate as confiscatory, where reference to a master is not on consent, but to make findings of fact, which shall be advisory only, the court is not required to make findings on each exception to the master's report.

In Equity. Suit by the Consolidated Gas Company of New York against Charles D. Newton, as Attorney General of the State of New York, Lewis Nixon, constituting the Public Service Commission of the State of New York, First District, and Edward Swann, District Attorney of the County of New York. Decree for complainant.

See, also, 260 Fed. 244.

This is a suit in equity, brought by a gas company in the city of New York to enjoin the execution by the defendants of chapter 125 of the Laws of 1906 of the state of New York, which imposed on the plaintiffs, among others, a limitation of 80 cents in the rate which it might charge to consumers. The suit was begun in January, 1919, and made defendants the Attorney General of the state, the district attorney of the county of New York, and the Public Service Commission of the First District, who are charged with the prosecution of violations of the statute.

A master was appointed on May 16, 1919, to take testimony, make computations, and report back to the court with all convenient speed. Over 15,000 printed pages of testimony were taken, upon which the master has filed a report. More than 100 exceptions have been filed to the report, and the cause now comes on for hearing on these exceptions.

The suit is in sequence to a former suit under the same statute, begun on May 1, 1906, against the predecessors of these defendants and the city of New York. This was also tried before a master and argued before the Circuit Court, which granted a decree in favor of the plaintiff. Consol. Gas Co. v.

New York (C. C.) 157 Fed. 849. The defendants appealed to the Supreme Court, which reversed the decree and dismissed the bill, giving leave to the plaintiff, however, to file a new bill at any subsequent time, when experience might have demonstrated that the rate fixed by the statute was inadequate to a fair return upon the value of its property. Willcox v. Con. Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034. This decision was rendered on the 2d day of January, 1909, so that the defendant allowed 10 years to elapse, during which it operated under the statutory rate, before beginning this suit.

The bill is of the usual sort in rate cases, alleging that the rate is confiscatory, in that it prevents a fair return upon the property of the company, that the penalties imposed by the statute are so large as to crush it in the event of disobedience, and that it has no means of testing the constitutionality of the act, except by a suit in equity. The jurisdiction of this court and the equity of the bill, if the allegations are maintained, is not disputed, and is amply supported by prior adjudications in similar cases.

The plaintiff is a corporation organized under the laws of the state of New York under chapter 367 of the Laws of 1884, which permitted the consolidation of six gas companies then doing business in New York City, all of which had been in existence for a long time, one of them as far back as 1823. At the time of the consolidation the value of the stock of the six companies as then quoted on the Stock Exchange of that city was close to $40,000,000. The stockholders agreed upon a plan of consolidation in accordance with the statute, in which they fixed the value of their franchises as $7,781,000, and the value of their other property at about $30,000,000. For this, stock in the amount of $37,785,000 was issued, of which over $2,000,000 was held in the treasury and the other $35,000,000 issued directly to the stockholders of the constituent companies. The company began business in November, 1884, and the stock was increased in April, 1900, to $54,595,000, and later in July of that year to $80,000,000. At the present time there is outstanding $100,000,000 of capital stock and $25,000,000 of 7 per cent. convertible bonds.

The master found the value of the assets of the company, including its franchises, at about $75,000,000, and its annual sale of gas at the present time about 19,000,000,000 cubic feet. Upon this he found a probable income for the current year of about $900,000, representing not more than 1.2 per cent. on the value of the property as found. He further found that the necessary rate of return at the present time was 8 per cent., requiring an income of about $6,000,000 upon the same value.

The master found the net cost of delivering gas to the consumer by the company was 75.18 cents per 1,000 cubic feet. This finding he based upon the full year 1918 and the first 8 months of the year 1919, contenting himself with the statement that the prices of labor and materials since August 31, 1919, had become higher than during the period of 20 months which he had considered.

In view of the voluminous testimony and the great number of issues which are concerned, it would serve no purpose to recite in detail more of the findings or any of the evidence.

William L. Ransom, John A. Garver, Charles A. Vilas, and Jacob H. Goetz, all of New York City, for plaintiff.

John P. O'Brien, James A. Donnelly, and Harry Hertzoff, all of New York City, for defendant corporation counsel.

Wilber W. Chambers and Clarence R. Cummings, both of Albany, N. Y., for defendant Attorney General.

William Hayward, John Holley Clark, Jr., and Ely Neumann, all of New York City, for defendant Public Service Commission.

LEARNED HAND, District Judge (after stating the facts as above). This bill was filed under the leave given in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A.

(N. S.) 1134, 15 Ann. Cas. 1034, to begin a new suit of the same kind after a period of probation should have tested the adequacy of the rate established by the statute. Ten years passed before this was done, and the experience gained meanwhile would, under ordinary circumstances, have been sufficient. However, during that period there occurred the extraordinary rise of prices due to the Great War, which has made the future harder to forecast upon the basis of 10 years' past experience than could have been apprehended in 1909, and as a result we are not in so good a position at the present time to judge of the future effect of the statutory rate as we should normally have been; i. e., the experience of the first 7 of the 10 years is of little present value.

## The Proper Period for a Test.

[1] The defendants wish me for this reason to take an average over the whole period, both for cost of production and capital valuation. Now, whatever may be the proper method, that certainly is wrong. The case is not one in which an average can safely be made, because the variations in prices which the whole period covers are not normally recurrent. Averages presuppose that the resulting figure will cover variations, which, though certain, or nearly certain, within the period taken, are impossible of exact prediction in their occurrence. They may therefore be spread over a period precisely as an insurance loss is spread. The recent rise in prices is not of this kind, because there is no reason whatever to suppose that during the next period of say 5 years, which is long enough to justify some present action, the same causes will operate in reverse as have operated in the past. An average would be therefore meaningless. Either the evidence of the last 3 years is sufficient basis for a forecast or it is not. If not, ante bellum values should be used merely for lack of any better; if so, the average of the last 3 years is the proper basis.

It is quite true that, if these prices could fairly be regarded as such temporary aberrations as the rate was meant to cover, this would not be so. Persons who embark their money in such enterprises must take the bitter with the sweet, and the lean years with the fat. Rates, when established, are not intended to make a nice adjustment to all ensuing conditions; they are too long and costly to fix, especially in court. In such cases it is fair to take a period of years as the defendants wish and to compare that with the rate. But if, as I think, we have now fair warrant for supposing that we are in a condition not contemplated at all when the rate was fixed, all such considerations disappear.

Several reasons lead me to believe that present price levels are not merely transitory, though I recognize the danger of any prophecy. Whatever their precise cause, it is universally conceded to be due to the Great War, and by that I mean, of course, not to the prosecution of hostilities, but to the economic exhaustion and inflation of the circulating medium which these involved. In general, it is a safe inference to suppose that Europe will not be able to resume its ante bellum production for a time measured rather by years than by months, and that the recovery of a sound financial condition will take longer. We in

this country are not only influenced by conditions in Europe, but we are subject to our own local inflation and disorganization of industry, from which no one can know when we shall recover. The question is a practical one, and comes, I think, down to this:

The plaintiff is faced with a condition which permits it to receive much less than the return which the statute contemplated, and which the Constitution is thought to insure it. So far as human foresight can see, that condition, though probably not permanent—certainly in its present exaggerated form—is bound to exist over a period of some years, at least in such things as coal, oil, and labor, which are the plaintiff's chief costs. There is, then the certainty of a continued loss for an indefinite, but substantial, time, due to causes which were not in existence and could not possibly have been apprehended 14 years ago, when the rate was fixed. Does this prospect justify the court in abandoning the inertia which it properly feels when the complaint is based upon temporary variations? Is it fair to continue to impose a rate which has clearly ceased to correspond with the underlying presuppositions upon which it was based? I think that the prospect does justify the court, and that the rate has become unfair, at least until the conditions change.

Three reasons justify this assumption now, each of them serving to protect the public against the consequences of a mistake. The first is that at worst the rate will not be finally declared insufficient. As in all such cases, the defendant will have leave at any time to vacate the decree upon showing that the old price levels have been reached, or nearly enough to put again into effect the statutory rate. This does indeed impose a burden of proof upon the state when that time comes, but a denial of any relief now causes certain and irremediable damage to the company for so long as present prices remain. While constant readjustments are impracticable, and for this reason public service companies must endure transitory periods of insufficient profit, high and rising price levels have already lasted a period of 30 months, January 1, 1918, to August 1, 1920; enough, I think to throw the initiative upon the state of showing that conditions have changed, when they do change. The second factor is the present discrepancy between the rate and a fair profit which gives a reasonable assurance that the period and the fall in prices must be substantial before the rate can prove sufficient. It also makes more imperative some relief to the company. The third factor is that it is not in the least essential that the state should have recourse to the unwieldy process of a new suit, which an application at the foot of the decree in effect would be. The Legislature, by an amendment to section 72 of the Public Service Commissions Law of New York (Consol. Laws, c. 48), may at any time give to the Public Service Commission jurisdiction over rates, not only below, but above, the statutory maximum, whenever the statute is in abeyance. Indeed, that might have been thought to be now the law, had the opposite not been declared in People ex rel. Municipal Gas Co. v. Public Service Commission, 224 N. Y. 156, 120 N. E. 132. By such a change the whole subject could be regulated by that authority to which, if I may say so, it properly belongs, and a procedure establish-

ed plastic enough to make unlikely the continuance for 14 years of a fixed rate in the face of changes such as have occurred.

So far as I have found in the books, a test of two years is enough. In the Minnesota Rate Cases, 230 U. S. 352, 469–472, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the rate fixed by the authorities for the Minneapolis & St. Louis Railway, the only one disturbed, was set aside on an experience of only one year. In Municipal Gas Co. v. Public Service Commission, 225 N. Y. 89, 98, 121 N. E. 772, a complaint was sustained which alleged the insufficiency of a rate for a period of only two years, 1917 and 1918. In Darnell v. Edwards, 244 U. S. 564, 37 Sup. Ct. 701, 61 L. Ed. 1317, the period was thought too short, but it included only six months, and those not including the recent era of inflation. In Rowland v. St. Louis, etc., Co., 244 U. S. 106, 37 Sup. Ct. 577, 61 L. Ed. 1022, a rate was upset upon a showing of only two months, coupled with opinion evidence of its being a fair test. Excepting these cases, I know of no judicial ruling on what length of time is necessary.

The master has taken complete evidence over a period of 20 months, from January 1, 1918, to August 31, 1919. Since that time 11 more months have passed, during which there has been no fall in price levels. The record has some evidence of this down to a later day, but of course, not down to the date of this opinion. But evidence is not necessary in the face of so patent and obtrusive a fact of daily life, and it is quite fair to say that the condition which the master found as of August 31, 1919, has been aggravated during the succeeding year. The period, despite its unusual character, I find to be a sufficient basis for the calculation of the cost of production and the "rate base" for a future time long enough to call for some judicial action.

## Computation of the "Rate Base."

[2] I have just said that the present range of prices seems to me applicable, not only to the cost of production, but to the valuation of the "rate base"; i. e., the permanent means of production, and this necessarily involves a decision upon the vexed question as to the values upon which the company is to be permitted to earn its profit. Costs of production involve those items which the company must pay before it begins to see any profit whatever; its economic motive for embarking in and maintaining the enterprise depends altogether upon the return which it can get out of the property which it has bought and erected into an industrial unit. Hence it is the profit, and, strictly speaking, this alone, which matters with the stockholders. It must be owned that much of the discussion shows either a timidity or an inability to grasp any principle in dealing with the "rate base." With deference, it appears to me to be merely an abandonment of any attempt to deal intelligibly with the question to say that cost of reproduction and the original cost are each elements to be considered. That statement can mean nothing whatever, unless it is accompanied by a constitutive rule, which will establish some standard in the ascertainment of which these may be used. It would be understandable to say that the two estimates should be averaged, but such a rule could obviously command no

support, because it would correspond to no relevant considerations of policy. Merely to leave the question with a caution that several elements are to be considered is to abandon any effort to solve it.

The recurrent appeal to a just rate and a fair value assumes that the effort is to insure such a profit as would induce the venture originally and that the public will keep its faith so impliedly given. That, I think, involves a tacit comparison of the profit possible under the rate with profits available elsewhere; i. e., under those competitive enter- prises which offer an alternative investment. The implication is that the original adventurer would compare future rates, varying as they would with the going profit, and would find them enough, but no more than enough, to induce him to choose this investment. By insuring such a return it is assumed that the supply of capital will be secured necessary to the public service. As the profits in the supposed alter- native investment will themselves vary, so it is assumed to be a con- dition of the investors' bargain that their profit shall measurably fol- low the general rates. It is, of course, not relevant here to discuss these presuppositions, since they have now the support of authoritative law.

Certain risks in ordinary competitive enterprises can be reason- ably anticipated, and business practice includes them in an amortiza- tion account. New processes and machines are constantly appearing which make the old obsolete; ordinary wear and tear makes replace- ments necessary. The return to make these good is commonly carried in a separate account by all prudent business men, and does not come out of the rate. It is true that individual misfortunes cannot be fore- told, and these a given company must bear, just as any single competi- tive venture would have to bear them. Among these, however, is not a general rise in prices, which, affecting all alike, at least after a time, enables each to raise his price, not only because of his costs in labor and in materials, but to obtain a proportionate increase in his profit, based upon the increased value of his plant and machinery. All competing producers who give the same service must keep invested an increased number of dollars in capital to do so. The risk of the de- preciated dollar is not one which industry in general will bear; it is, indeed, no risk at all.

Moreover, a profit based upon the enhanced value of the capital adds nothing in truth at all to the company's wealth. Though its capi- tal be measured in more dollars, and so, too, its profit, that profit is still paid in the fallen dollar, and has no greater buying power than it had before. The increased valuation of the capital will for the years of the depreciated dollar leave the company exactly as it was; it will merely prevent its being compelled to share its putative fair profit with its customers, which by hypothesis it should not be asked to do. The company gains nothing; the customers lose nothing.

Indeed, all this is so much in the primer of economics that it is in- conceivable it should be misapprehended as to working capital for in- stance, and the contrary view has crept in, I think, only when one thinks of the more permanent kinds of capital, and instinctively as- sumes that the rate will apply after that capital has resumed its former values, if it ever does. There is, in short, a tacit assumption that the

valuation must last as long as the permanent capital. There is no warrant for that assumption, because precisely the same reasons which compel the "rate base" to be raised, after a rise in price, compel it to be reduced after a fall. There is a natural enough reluctance to a continuous reappraisal of plants, and properly so. It must, of course, appear that the variation in prices is not transitory, and the period of probation before a company is allowed relief is precisely to insure against that possibility. The chance of loss during that period such companies must' endure, and there is an inevitable "lag" in readjustments in each direction. But, once it appears that the new price levels are not transitory, it is no answer to the company's complaint to say that at some future time prices may fall. When that time comes, if it does, the property must again be revalued; but meanwhile they are entitled to some protection, and since these have become questions for the courts, to the protection of the courts.

The rule of the present reproduction cost, which is a necessary consequence of the foregoing argument, appears to me to have been either expressly or implicitly recognized in all the cases in which the Supreme Court has passed on these matters. Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134, Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244, Knoxville v. Knoxville Water Co., 212 U. S. 1, 10, 29 Sup. Ct. 148, 53 L. Ed. 371, The Minnesota Rate Cases, 230 U. S. 352, 434, 454, 455, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, San Diego, etc., Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154, San Diego, etc., Co. v. Jaspar, 189 U. S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892, Darnell v. Edwards, 244 U. S. 564, 568, 37 Sup. Ct. 701, 61 L. Ed. 1317. It is true that its application has not distinctly arisen since the recent rise in prices, but it is not possible that it should have general application, and yet not cover this, its most glaring illustration.

I am, of course, aware that the present cost of a plant, and especially of a putative standard plant, is hard to prove; but that is no answer. It may in fact be the case, usually it is, that the safest basis for estimate is the evidence of what the actual plant cost, with its additions, which are not renewals, or a cover for renewals. The mere opinions of experts are a doubtful reed; we need not lean upon them; but the question of evidence is one, and of what it shall show is another. I am aware, also, that in the case of railways the principle of reproduction cost presents most baffling problems, perhaps fatal to its application;[1] but these arise from the fact that the valuation of a substituted service in the case of railways is impossible, without already presupposing the existence of a railway, so much do railways affect the whole life of the community. In the case of the land used by a gas company, the valuation may theoretically be said to involve a similar begging of the question, for without gas a modern city would be another place. Nevertheless, land and building materials and ma-

[1] Gerard C. Henderson, 33 Harv. Law Review, pp. 902, 1031.

chinery have a value independent of the existence of this or that or any gas company. No "gas value" is involved, as was "railway value" in the Minnesota Rate Cases, supra. All the component elements are purchasable, and the cost of the standard plant can be ascertained with fair accuracy. The single element of the cost of tearing up the streets must, however, on authority be omitted. Des Moines Gas Co. v. Des Moines, supra.

## Depreciation.

[3] The defendants insist upon the element of depreciation, based upon an allowance each year of that proportion of the total value which a year bears to the whole life of the plant. The Supreme Court (Knoxville Water Co. v. Knoxville, supra; Minnesota Rate Cases, supra) has recognized that some depreciation is a proper element in estimating the "rate base," but has not as yet authoritatively settled on what principle it shall be calculated. It seems to me hardly possible in the case at bar to avoid taking a position with regard to that principle.

If the proper standard for a "rate base" is the present cost of a substitute plant of equal capacity, as I believe, depreciation can be a function of it only in case the allowance for renewals to the plant under consideration will in the future be greater than that of the assumed standard. If the rates allowed in the future include only an allowance for renewals of a new plant, the company will have to abate something from its normal profits because of its extraordinary renewal charges. Theoretically it makes no difference whether this problem is met by giving the plant a smaller value at present because of its future greater renewal charges, and then allowing a higher rate for renewals, or by giving it its present value, based on capacity, and letting it bear its extra renewals out of its normal profits. Were the plant sold, the future abnormal renewals would be reflected in the sale price, being discounted at once; but that would be because the parties must at present clear their accounts once and for all. The seller would be unwilling at once to abate from his price, and later to allow the buyer from time to time for his unusual renewals. In the case of a public service company, where the authorities may always require the plant to be kept up to standard, there is an obvious advantage in declining to attempt a repeated adjustment between the actual renewals necessary and normal renewals, as would be necessary if the present prospect of such allowances were now discounted; it is the better practice to allow the plant to bear its own extra renewals and to insist that it shall always be kept up. Therefore it appears that, so far as concerns the future, the age of the plant should not be a function in the "rate base."

[3½] On the other hand, in computing the "rate base" from the original cost, depreciation is of vital consequence. Practical men will prefer to ascertain the cost of a present plant by experience, when they can, rather than by estimate, just as the master here has done. In so arriving at the cost of a present plant of equal capacity, it is clear that the original cost of the plant in question must be abated by depreciation, so far as that is reflected in a loss of capacity. In such a calculation, however, there must figure past renewals as an offset to past deprecia-

tion, and, if in fact the capacity has remained the same, depreciation should not be a function of the "rate base" at all. In such a case the inquiry as to depreciation should be confined to changes in "price levels."

## Franchises.

[4] If this case were res integra, I should not hesitate to refuse any valuation to the company's franchises. On principle the case is very clear. A franchise is a right to keep mains in the streets and furnish gas to the inhabitants of the city, and it is granted upon condition that the rates shall be controlled. If the franchise gets a value because the rates have not been controlled, the "reasonable expectation" of their continuance is without basis, and that is the only possible ground for a vested interest in such rates. The inaction of the authorities in the past gives no prescription, and without such prescription the franchise can have no capital value, unless the very point is assumed. That the franchise has a kind of value is, of course, true enough; it alone protects the "tangibles" from becoming junk; but as a part of the "rate base" it should never figure. This was all stated in Consolidated Gas Co. v. New York (C. C.) 157 Fed. 849, and not denied in the Supreme Court; but each court thought that the incorporation under the statute of 1884 constituted a recognition by the state of some capitalizable value to the franchises of the company, and the Supreme Court fixed that at $7,781,000, the original sum. That was in 1909, 25 years after the company had been organized, and when its business had grown very substantially. I own that I am not clear whether or not the Supreme Court meant to declare that this value should exist perpetually as a means of drawing a profit of 6 per cent. or more; but it is clear enough that, if it was worth that sum in 1884 and 1909, on any conceivable theory it is worth as much in 1920. Therefore it appears to me that the master did all that he could under the circumstances in adding that sum to the "rate base," at least until the Supreme Court shall indicate some contrary rule.

The defendants, however, urge that the franchise rights of the company have changed since 1909. Their contention rests upon circumstances which are more detailed than it is necessary to set down here, but the substance of which is as follows: The constituent companies, consolidated in 1884, held a number of legislative grants to furnish gas in New York and to lay mains in the streets. These were all substantially similar in this respect: That the consent of the municipality was necessary before the streets could be opened. In the case of each franchise the municipality gave its consent to the opening of the streets for a limited period only, and before 1909 that period had expired in the case of all but three; i. e., the "Anthracite," the "Harlem," and the "Knickerbocker." Of these, the last two affected only such territory as lay north of Seventy-Ninth street in New York; that is, the district last populated. In 1913 the consent to dig up the streets given under the "Anthracite" franchise also expired, so that at the present time the company has no such rights south of Seventy-Ninth street. North of that street it has such rights as the municipal consents under the "Har-

lem" and "Knickerbocker" franchises still give it. Not only does the "Anthracite" franchise still exist, shorn of the consent to dig up for new mains, but the company has several other franchises of the same character, under which consents were originally given to dig up the streets, which had long since expired before 1909, and, indeed, with one exception, before 1884.

Therefore the change in the company's rights since 1909 comes to this: That it now has no more rights to dig up the streets south of Seventy-Ninth street, which it had until 1913 under the "Anthracite" franchise. Its right, however, to maintain its existing mains and to furnish gas to its customers is not affected by the expiration of that consent. New York v. N. Y. Mut. G. L. Co., 207 N. Y. 647, 100 N. E. 427. The change in the value of the franchises turns upon the value of the right which existed in 1909, but exists no longer, to lay new mains in the streets below Seventy-Ninth street, if the municipal authorities consented. Obviously that question cannot be answered. Not only does this record show that the streets are already so full that no other mains could in any case be laid, but the original right was not absolute, depending as it did upon the exercise of the discretion of the municipal authorities before it could be enjoyed. It seems to me a fanciful conclusion to attribute any value to the right to require by mandamus (Ghee v. Nor. Un. G. Co., 158 N. Y. 510, 525, 53 N. E. 692) the exercise of such a discretion in a territory where, under the record, no intelligent authorities would in any event grant such a right or could be required to do so. The substance of the right remains, and has been expressly so adjudicated in an analogous case. Perhaps the Supreme Court may choose to modify its original ruling upon the whole subject, but it would be a most unreal distinction to base such a modification upon the slight differences which are shown in this record. I shall therefore accept the valuation as settled in the earlier case and by the master here.

### Rate of Profit.

Another preliminary question is that of the proper rate of profits. In Willcox v. Con. Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, the rate of 6 per cent. was accepted as a proper return. In Denver v. Denver Water Co., 246 U. S. 178, 194, 38 Sup. Ct. 278, 62 L. Ed. 649, the same rate was impliedly accepted. In Lincoln v. Lincoln Gas, etc., Co., 250 U. S. 256, 39 Sup. Ct. 454, 63 L. Ed. 968, the court indicated that changed conditions of investment might change the rate. Eight per cent. was mentioned, though probably not as intended to cover the case of a sure monopoly such as this was described to be in Willcox v. Con. Gas Co., supra. The evidence in this record indicates that 8 per cent. is the going rate at the present time, and that stands uncontradicted. For many months past the United States, certainly the most solvent debtor in the world, has paid either 6 or nearly 6 per cent., and other governments higher. As the facts develop in this case, I need not find any rate, except to say that less than 6 per cent. would be insufficient. I have made findings based upon both 6 per cent. and 7 per cent.

267 F.—16

If the rate is to correspond with the market, 7 per cent. would scarcely seem too high, and at least so much appears to have been taken as the standard in Lincoln v. Lincoln Gas Co., supra, the last declaration of the court.

### The Admissibility of the Books of Account.

[5] Most of the evidence and testimony in the case at bar necessarily depended upon the records of the plaintiff contained in books of account of all descriptions, supported by vouchers, books of original and secondary entry. These were proved only to the extent of showing their general character and that they had been kept in the usual course of the company's business. The same applied also to the Astoria books; that company being treated as though it were an operating unit of the plaintiff. Indeed, these books the defendants themselves offered in evidence.

The defendants objected to the reception of all other books on the ground that they were not properly proved. Probably the proof was inadequate, even under the present-day laxer rules, had they been used in an ordinary case, as for example, to prove transactions recorded in them on which obligations of a third person depended. The case is not such. This is a suit between the authorities of a state and a company long since recognized as performing a public service and under the regulation of the state. Article 4 of the Public Service Commissions Law of New York puts the entire conduct of such companies as the plaintiff minutely within the regulation of the Public Service Commission. Section 66 gives the commission general supervision over all such, power to investigate the quality of their services and to fix its character, to prescribe the form of the records and books it shall keep, to examine its officers and those records, to keep informed as to its doings and its property, to require a detailed annual report, including its receipts and expenses, and any other important facts it may wish, to enter upon its property and examine its books and vouchers, to compel the production of any such, to subpoena its officers, and to compel it to keep its accounts of separate businesses separately.

Books kept in accordance with orders lawfully promulgated by the commission under such powers are on a different footing, in a suit based upon the action of the state and against its officers, from even the same books, if attempted to be used elsewhere. They have a public character, derived from the supervision which can be and is exercised over them. The authorities are not, of course, bound by them in any event; but, prepared as they are, under their direct and constant supervision, they can scarcely be put in the category of the usual ex parte entries about whose admission the cases are concerned. The state, having had so much hand in their creation and such continuous power of examining them, should not be entitled to demand a verification first hand of every item by common-law proof, before they become prima facie competent. The guaranty of their truth is sufficiently established by the scrutiny to which they are always subject, and the penalties which follow upon a disregard of the commission's orders. Section 73. It would, indeed, be an incredible burden to require every item to

be separately established, and even these defendants have not gone so far as that; but, if the books are not prima facie competent, they might call for such proof, nor can I reject them without putting the company upon their mercy.

Documents prepared in an analogous fashion came before the court in Rowland v. St. Louis, etc., Co., 244 U. S. 106, 108, 37 Sup. Ct. 577, 61 L. Ed. 1022, and Northern Pac. Ry. v. Keyes (C. C.) 91 Fed. 47, 58. In each the court received them, though in disregard of the strict rules of the common law, because of the opportunity afforded the authorities to check their accuracy by a recourse to the original records, and, if necessary, to the entrants who actually made them. In neither case did it appear that the company was under such stringent supervision as has been established in New York. Here, as in Rowland v. St. Louis, etc., Co., supra, it may be said that the company—

"exhibited its work sheets and data to the [defendants], that the returns were made by the employés in the course of their business, and that if the [defendants] had desired to question any of the data they could have called for further verification."

Nor, indeed, were these books admitted until Teele had made a thorough checking of all the items by their vouchers for the period of a month or more, submitting them in this way to an honest test of their accuracy. The "purely negative attitude" of the defendants is not consonant with that desire "not to seek an unjust advantage from the difficulties of stating the company's case" which we are told must be imputed to a state in such affairs. Rowland v. St. Louis, etc., Co., supra.

I do not forget that in some respects, altogether inconsequential, so far as I can see, the books did not strictly conform with the orders of the commission. These variations were in good faith, and threw no doubt upon their veracity. They could have been easily corrected, had the Public Service Commission thought it necessary to correct them.

### The Plaintiff's Failure to Supply Candle Power.

[6] At the outset of the case the defendants insist that the plaintiff may not get equitable relief because of its violation of the statute requiring it to furnish gas of 22 candle power. While the requirement seems to be accepted by all competent persons as unnecessary and wasteful, it must of course be regarded as a duty imposed upon the plaintiff while it remains upon the statute book. A persistent and deliberate disregard of it might, I should think, bring this case within that somewhat indefinite rule which turns out of a court of equity a suitor who has himself been unjust in the very matter of which he complains. The situation here is short of that. In the first place, there is some question whether the readings made by the city employés charged with the duty are to be taken as against those of the plaintiff itself; indeed, on that subject, the master has found against the defendants. Apparently the tests are not absolute, and men may honestly differ as to their results; but I have not felt it necessary either to examine the method or to determine the issue upon the evidence for the following reasons:

The defendants prove many violations under their own tests, which were taken 10 times on substantially every day during the years 1916, 1917, 1918, and 1919; the master declining to go further back, and rightly, in my judgment. The importance of the failure to come up to the standard best appears from the averages. In 1916 and 1919 the average of all 10 monthly averages was never below 22 for any month; in 1917 the month of November averaged (taking all 10) 21.80, and in December, 21.99. It thus appears that through all this time the city's own charts show that the average for each month was up to standard, unless 1 per cent. is to count. The year 1918, was, indeed, quite different. From May 1st to November 1st the United States had commandeered the oil in two of the plants for making 'toluol, and the standard collapsed, falling in October to 14.92 (average of all 10 observations). For the other months of 1918 the averages are as follows: January, 20.61; February, 20.52; March, 21.63; April, 21.51; December, 20.98. These are the only months which need count, and the default amounted to 6.3 per cent., 7 per cent., 2 per cent., 6.3 per cent., and 5 per cent., respectively.

But I think that the defendants are in no position to take these figures against the company anyway, because of the conduct of the business between them. The company also made its own tests and sent the results daily to the city, which retained them and took no action. Except for January and February, 1918, and the period of the commandeer, the company showed averages equal to the standard. Their average for January was 21.36, and for February, 21.27, about 3 per cent. off. Now, it must have appeared to the company, and may well have been the case, that the acquiescence in these tests indicated either that the city was not confident of the superiority of its own tests, or that they meant to make no complaint of such slight variations. The standard is not useful anyway, and it was to every one's interest not to have the company use more oil than was absolutely necessary, for oil is extremely expensive. In any case, such a plea comes now with the illest grace to defeat a suit so vital to the company, after such acquiescence. The issue of the correctness of the company's tests was certainly waived, and the whole defense boils down to the deficiencies in the months of January and February, 1918, as to which "de minimis non curat lex." It is not quite true to say that the whole thing does come down to that, because the defendants do even assert that the company should be charged with the defaults during the commandeer. More hardly seems necessary than to allude to such a sorry plea in a court of equity.

### Gas Unaccounted For.

Into all the calculations there must come the loss of gas occasioned by condensation, leakage, and perhaps other causes. It becomes necessary to know by how much the plaintiff's production must be taken to be larger than the sales passing through the customers' meters. While it is quite possible to tell this with accuracy for the whole system of which the plaintiff is a part, it is imossible to do so for the plaintiff separately, owing to the interchangeable connections of the mains. The loss of the system as a whole has been reported yearly to the

Public Service Commission, and represents the difference between the gas made and the sum of gas recorded by customers' and company's consuming meters. The years 1917 and 1918 were abnormally cold and showed an unusual loss of this kind. Obviously they are not a fair specimen of the normal loss occurring from these causes. The average for the whole system over the period of 13 years during which the statistics were given to the authorities was 5.31 per cent., and, unless there are some disturbing factors, this is a valid starting point, which the company must accept. The only disturbing features suggested here are the poorer quality of coal and oil, and I take against the plaintiff any doubt which those factors may raise. I accept the average of 5.31 as a proper allowance for the system as a whole, at least in a rate case.

The allowance to the company is certainly less than this figure, but how much must remain in doubt. The estimated average as reported by the plaintiff to the Public Service Commission for the years 1906–1918, inclusive, was 4.09, and there is a strong presumption that this is correct. Nearly the same result may be reached by another method. It appears to be accepted that 3 per cent. is the proper allowance for all waste but main leakage, which varies inversely with the density of the customers per main mile. Now, taken grossly, the company has about double the density per main mile of the other companies. We may then apportion the sum of 2.31 per cent for main leakage correctly by dividing the main mileage of the company in half and using the resulting sum for the total mileage. Assuming the total output to be 33 billions, of which the company will furnish 20 billions, the systems' loss from main leakage is 762.3 millions, of which the loss attributable to the company is 28 per cent. or over 223 millions. This is about 1.12 per cent., which, with 3 per cent., equals 4.12 per cent. of the gas made, which is surprisingly close to the average reported by the company itself. I shall therefore take 4.1 per cent. as the proper figure for gas unaccounted for.

### Price Paid by the Company for Oil.

Oil is the principal ingredient in the manufacture of water gas, and has of late been rising sharply in price. As it figures so largely, the defendants have made a strong attack upon the contracts made and the prices paid by the plaintiff, and this had best be decided before the account is stated. The company has always bought its oil from the Standard Oil Company of New Jersey, which has a common director with itself, who is on the plaintiff's executive committee, to which were referred all oil contracts. It may be assumed that there is also some common stock ownership. The position, at least of the learned corporation counsel, is that, owing to this community of interest, the company has favored the Standard Oil Company of New Jersey in its contracts, necessarily throwing upon the stockholders of the company a heavy loss, unless it can in turn impose it upon the public. As this charge is equivalent to a fraud in the conduct of the company by its directors, it deserves scrutiny.

Between November 1, 1905, and December, 1919, the company made in all nine contracts for the purchase of oil, not only on its own

behalf, but for its constituent companies, all of whose needs it supplied. The result was that it was a very large purchaser of oil, making contracts for over 100 million gallons at a time. There is no reason to question the propriety of its course, provided it bought honestly and with proper care to get as good a price as possible. There were in New York a number of independent small companies buying oil at the same time, and the best evidence, as it appears to me, of the proper price to be paid, can be gathered from the prices at which they bought. Other contracts were put in evidence, made in New Jersey, Philadelphia, and one in Boston, and these, too, are relevant, especially those in New Jersey. In New York, during the 14 years in question, in all 77 contracts were made, besides those of the plaintiff. These were all for much smaller quantities, and it might naturally be expected that they should be at higher rates; but this is not necessarily true, because the substance is a by-product of not unlimited supply, and it has lately come into other uses, which have increased the demand. It seems doubtful whether a large contract, commanding a substantial part of the supply for a period of one year or more, must be at lower prices than a small one. That is the one conceivable reason for questioning the prices obtained by the company, and it appears to me an insufficient one, especially in the light of the very large Philadelphia and New Jersey contracts. A comparison may be made of each contract of the company by taking the average of all others in New York made within 6 months, on either side of that taken, and the following table is so computed, except in the case of the last two contracts, which were at too short intervals to permit that course; the second being a modification of the first:

| | | Company's Rate. | Average Rate of other N. Y. Companies. | |
|---|---|---|---|---|
| Nov. | 1, 1905 | .... 4.29 | 3.062 | (2 contracts) |
| Jan. | 5, 1909 | .... 3. | 2.78 | (6 contracts) |
| Jan. | 1, 1911 | .... 3. | 2.742 | (3 contracts) |
| July | 1, 1913 | .... 5.035 | 5.462 | (5 contracts) |
| July | 1, 1914 | .... 3.035 | 3.62 | (9 contracts) |
| Nov. | 13, 1916 | .... 5. | 4.8 | (6 contracts) |
| Dec. | 4, 1917 | .... 6.5515 | 6.785 | (6 contracts) |
| Dec. | 18, 1918 | .... 7.5721 | 7.528 | (6 contracts—November and December, 1918) |
| March 28, 1919 | | .... 6.0824 | 5.904 | (3 contracts, two in March at 6.081 and one in June at 5.75) |

It is, of course, plain that this table may be misleading, because the price varied much within a year. It may be corrected by a comparison within a month on either side of the contracts without change of result. This shows that at least for the last 7 years the company always bought at about the going rate. It is clear beyond peradventure that, based upon New York prices, the charge is utterly baseless that the company was paying more than the market, so far as there may be said to have been a market.

Nor was the New Jersey price substantially different from the New York price. This price is evidenced by four contracts between the Gulf Refining Company and the Public Service Gas Company of New Jersey, for very large amounts. The first of these was on June

1, 1910, and the prices varied between 2.48 and 2.82, according to place of delivery. At that time the prevailing price in New York was about 2.45; the company making no contract for seven months thereafter, by which time the New York price had risen. The next was on May 25, 1913, between 4.50 and 5 cents. The New York price ranged from 5 to a fraction more. The next was on August 5, 1914, at prices between 3.05 and 3.55; the New York price being between 3.25 and 3.50. The last was on June 21, 1919, at prices between 5 and 5.85, when the New York price was from 5.75 to 6.08.

The Philadelphia contracts were five in number. The first was September 30, 1912, at 3.95. In September of that year the New York price was 4.18, in November 4.5, and in December 3.1875. The second was on October 21, 1913, for 4.45; the nearest prices in New York were January, 1914, 4.25, and July 1st, 5.035. The third was on August 5, 1914, at 3.05; and the fourth on September 24, 1914, at 3. The New York price on June 1st (company's) was 3.035, and on September 10th, 3.5. The last two contracts were on September 23, 1919, and October 21, 1919, at 5. The nearest New York prices were June 24th, 5.75, and December, between 7.05 and 7.55. Of these five, the last alone shows any marked divergence, accounted for by a very sharp rise in the last month of 1919. While the Philadelphia prices are on the whole lower than New York, there is no divergence which may not be accounted for by differences in transportation.

The single Boston contract was on September 29, 1916, for 3.625 to 3.995. At that time the New York price was 4.75 to 5, about a cent more. This alone, of all the contracts offered, appears to show a very substantial divergence, which is not accounted for.

The upshot of it all is that, unless all the other New York companies were paying too much for oil, the plaintiff was not, and that, as compared with the eastern towns of New Jersey and Philadelphia, New York was not, on the whole, paying enough more to justify any inference. The charge of a sinister connection between the company and the Standard Oil Company of New Jersey appears, therefore, to be without the slightest evidence. The proper price for oil in calculating the future cost of production is hard to fix. At the end of 1919 in New York, as based upon three contracts made in December, it was about 7.25 cents. The master has accepted a price of 6.9 plus lighterage as of the date of his report. He has allowed in his calculations, as of the first 8 months of 1919, 6.8; that being the actual price paid by the company. I have no doubt that this was an honest price, made in a genuine effort to do the best possible, and it is certainly less than could have been got later in that year. It is a most conservative figure for reckoning costs for the future, so far as can now be seen, and I accept it.

### Substitution of the Coke Oven System.

The defendants urged that, in view of the increased price of oil, a proper distribution between coal gas and water gas would not be 22 per cent. to 78 per cent., the actual practice, but half and half, and that in producing coal gas another system should be adopted, known as the "coke oven" system, advocated by Mr. Little, their ex-

pert, who made an elaborate calculation of the cost under that method. This involved a new plant, and it cannot be successfully maintained that the plaintiff is now obliged to erect one at the cost of $8,000,000. Indeed, the defendants do not say so, but that they should have built such a plant long since, during the era of low prices. It is not, however, in my opinion, necessary to consider whether the plaintiff should build or should have built such a plant. The cost of production of such gas might still be a proper test of the production costs with which they should be credited, even though they cannot meet it. In short, their plants and methods might become obsolete through progress in the arts, and, if so, on a competitive basis they would have to bear the consequent loss. It would be a risk which is inherent in the industry, and one which, so far as it is covered at all, must be covered in the general allowance for replacements, or in the generally higher rates of profit which the industry should carry.

It becomes necessary, therefore, to consider the possibility of using the coke oven system at the present time in New York. In the first place it must be remembered that the purchase of such gas from others is out of the question. Some suggestion was made that this could be bought from the Seaboard By-Products Company of New Jersey, but that is too extreme to deserve any comment. Leaving out those companies who purchase "coke oven" gas, there are few who use it, about 12 in all, most of them in the Mississippi Valley, out of a total of 1,000 companies in the United States. Therefore I should doubt very much the propriety of using it as a test of normal cost, even where the conditions made it apparently feasible.

Ignoring this, however, the conditions are not feasible in New York. Little made his cost $.199. In so doing he gave an enrichment cost of $.0553, on an assumed candle power of 16. Mr. Little's figure for enriching the House A coal gas, which he assumed to be 16 candle power, was $.0678, and was in fact, as Sangster's report shows, $.1155. I think he has got his enrichment cost much too low. It is fair to assume that his error in the figures for House A, both in candle-power and cost, enter here, and, if so, that cost must be raised $.06, making a total cost of $.259.

Little's whole theory presupposes that a part of the residual coke should be sold at a price of $7 a short ton, and that the remainder should be credited at $6 upon the company's water gas production cost. He knew nothing whatever about the price at which coke could be sold in New York, except what was told him, and his information was erroneous. In 1919 the Seaboard Company was selling it continuously to the plaintiff at $6.55 a long ton, delivered alongside, and the cost of delivery was certainly 50 cents and perhaps 65 cents. The price to the Seaboard Company was not more than $6.05 to $5.90 per long ton, or $5.40 to $5.27 per short ton. Little figured 172,499 tons at $6, and 485,310 tons at $7, and his error is $.128 or $.146 (he appears to have been mistaken in admitting that the difference was 17½ cents). His price would become in the neighborhood of 40 cents; i. e., within 1½ cents of the coal gas price. Considering that his labor cost is only about one-half that of House A, and that his assumed coal price of $5.28 does not agree with Sangster's figures, even when

reduced to short tons, it is quite apparent that his conclusion of 20 cents for coke oven coal may not be taken as a basis for a substitute price. Furthermore, here, as elsewhere, he assumes an output of 82½ per cent. of total capacity in a year, which is greater than the actual output, even for the 3 winter months.

Mr. Doane had been for many years concerned with the coke market in New York and its environs, and up to 1915 had made more or less continued efforts to obtain a market for so much as the company did not use. After that time it became cheaper to use than to sell it; but his judgment, based upon his experience, is that it would be impossible to sell such large quantities as would be produced by the coke oven process. As a fuel it has great advantages, but the people are not used to it, and it requires different handling from anthracite coal, for which it is a substitute. In Doane's efforts he found this an effective barrier to its introduction. My conclusion is that, while the testimony is, as the master says, impressive, it would be unfair to assume that the coke oven system will be more economical, and that it is too uncertain anyway to justify taking its cost of production as a standard here; its results are too indeterminate. As to the so-called "chamber oven" system, it is too experimental yet to be taken as a substitute cost.

The other question is of the proper proportion of coal gas to water gas production. While the constituent oil of water gas remained a by-product, for which the demand was slack, there were great economies in its manufacture. Not only did it take very much less coal, but the plant was decidedly cheaper, and there was no problem in disposing of the residual coke. With the discovery of new uses for this oil, itself a residual, and the ability to extract gasoline from it, the price has greatly risen, and it is a doubtful question how long it can continue to be used. While the statute imposes a 22 candle power standard, both sides agree that a certain amount of water gas is a necessity, for the coal gas must be enriched, and this requires oil. Mr. Little gave the proportion of half and half as ideal, where such a standard obtained, though the practice of the plaintiff has been about 22 per cent. to 78 per cent. He said, however, that he was not aware of any such plant, and in December, 1919, when it was decided to add to the Astoria plant, a water gas unit was selected. This was after this case had progressed for many months, and the plaintiff knew that its practice was under criticism. It was, moreover, in the face of a sharply rising cost of oil. Ignoring the supposititious desire to play into the hands of the Standard Oil Company, which seems to me wholly apocryphal, for the reasons I have given, I can see no motive for it but an honest belief that, weighing all considerations, the chances still favored water gas manufacture.

Not only is the fixed capital item a factor, but the cost of coal is advancing with that of oil. Furthermore, it has been extremely difficult to get a proper supply of coal at all, and that difficulty still remains. It is due to transportation troubles, which we all hope will be solved in the near future; but solved they are not yet, and they must continue for a season to enter into the forecasts of a manufacturer who at any cost must be assured of a regular and sufficient sup-

ply of his raw materials. No one can, of course, prophesy what relation the costs of coal and oil will be in the future, and for the present I see no reason to revise the judgment of the ·plaintiff's officials in choosing this plant. As in other cases where the matter rests in their discretion, I think that a presumption exists that it is well exercised until the contrary is shown. I have therefore made all calculations on the present proportion of production, though the alternative of half and half is set forth alongside. It makes no difference in the final result.

### Cost of Production in 1918 and 1919.

Having disposed of these preliminary questions, it becomes possible to consider the cost to the plaintiff of making gas, so as to compare it with the rate. That cost is made up of four items: The cost of production in the gas house, the cost of distribution, taxes, and storage and replacements. The difference between the sum of these and the income is profits, and should be compared with a fair return upon the capital invested. I shall start with the cost of manufacture in the plant.

The master accepted for a standard the cost of manufacture taken from the books of the Astoria Company for the first 8 months of 1919. This is a plant over 10 years old; but it may, I think, be safely taken as a proper standard. Certainly Mr. Little thought that for coal gas House A, and for water gas House C, were suitable. He thought House B, not economical, because of the absence of certain labor-saving devices, though the item for labor was greater for House A in his estimates, but of House A he made no complaint.

I shall therefore take the analysis of the costs at House A for coal gas and House C for water gas, as taken from the Astoria books for the full year 1918 and for the first 8 months of 1919. Sangster, the defendants' accountant, was given full opportunity to examine these, and to check their accuracy, and his tables I use. His results must be accepted as true and valid, except in so far as any of the practice in that house can successfully be criticized. I know of no such possible criticism, unless it be the amounts of materials used and the extent to which the houses were driven. The second point comes up for consideration later, and upon the first I shall say but little. The amount of coal and oil necessarily vary with the quality of each. Every one agrees that the quality of coal has fallen off in recent years; it is urged that at Astoria the amount of coal is inordinate. Now, Mr. Woods' estimate of bituminous coal for coal gas was indeed only 200 pounds and that was ample before 1916; but in 1918 House A in Astoria used by Sangster's tables 207.6 pounds, and in 1919 nearly 211.5. These figures seem too large, and would have been so in the earlier years; but Mr. Little himself thought Wood's estimate too low at the present time, and insisted that 207 pounds was necessary, substantially the Astoria practice in 1918, and near enough to that of 1919 not to justify suspicion.[2]

[2]The correction would be so little that I think it not worth while making, certainly in 1918, the only year when the profits are at all near the rate. Thus coke, a residual, varies with the coal used, at least so Sangster says in his

The bench and boiler fuel accounts in either year was a very small proportion of the cost of materials, and any saving, if saving there should have been, would hardly figure appreciably.

As respects water gas, the necessary amount of oil to be used is not in much dispute, at least so I understand it. It is true that the average in the Manhattan plants has gone up from 3.80 gallons in 1913 to 4.1 in 1919; but that is less than 8 per cent. increase, easily accounted for by a change in quality. It is noteworthy that in 1915, long before this suit was in contemplation, the quantity used in the Manhattan plants was 4.06, substantially what it is now at Astoria.

As respects generator fuel for water gas, Sangster gives for House C 35.3 pounds in 1918 and 36.43 in 1919. These are higher than either Woods' estimates or the practice on Manhattan, but by less than 9 per cent. in 1918. The item is only 10 cents in that year, and if Manhattan results were accepted it would make a difference of .9 of a cent in the price. Whether Astoria got worse coal, or what was the reason, I do not know. I have corrected the water gas price by .9 of a cent for each year to allow for this, which seems to me the only correction necessary on any of the items.

Taking, then, House A as such a standard, and accepting Sangster's analysis of its actual expenses, we may start with a total cost of production at the plant meter for coal gas of $.4155. Sangster's figure for water gas at House C is $.44746, which I take at $.43846.

Taking the average of $.4155 and $.43846 on the basis of 22 per cent. for coal gas and 78 per cent. for water gas, the final figure is $.4334. If the proper proportion between coal and water gas be half and half, this figure would be $.4270. Allowing a loss of gas on the average of 4.1 per cent. the cost in the consumer's meter is for these two figures, respectively, $.4519 and $.4452.

Little's figure for ideal coal gas production at House A in 1919 is $.28 and for water gas at House C $.396. The difference is in part taken up in the cost of materials and in the number of employés; his estimate of labor being prepared upon hypothetical standards of what a proper plant should require. As to the cost of materials, the chief difference is the price of oil. Thus the difference for oil alone is $.03149, making the cost of water gas $.4275, if so corrected, as against $.43846. The apparent difference is much more marked in the coal gas made in House A, but most of it is in oil, repairs, and the like. For example, there is a difference of $.0477 in the cost of enrichment alone, which certainly should be taken on the basis of the actual amounts paid for oil and the necessary amounts used. Again for electric power, superintendence, and repairs he allows only $.0255 in all (as I figure the several items), as against actual expenses of $.08309, a difference of $.0576.

Thus, with only these corrections, which are inevitably proper from any aspect, his ideal coal gas cost for 1919 becomes $.3853 and his

report. The difference between the coal cost and the coke returns for House A in 1918 was $.05648. If I take 200 pounds for that year, the credit would be 96.6 per cent. of that, or $.05456, a difference of $.00192; 22 per cent. of this, with correction for waste, is only $.00046 for the difference in joint cost. The similar figure for 1919 is $.00183.

water gas $.4275. Taking these figures in the two proportions mentioned, and making allowance for 4.1 per cent. loss, his figures would be, respectively, $.4358 and $.4238. These differ from the figures for 1919 by $.0161 and $.0214.

Some part of this is probably accounted for by the fact that in Little's figures he considered House A as running at 100 per cent. per day for 310 days and House C at 100 per cent. capacity for 365 days. If this was erroneous, the fixed charges on each house were divided by too high a figure, and the result was too small per 1,000 cubic feet. I have already noticed a difference in the case of some of these items, but it will obtain in all those whose gross amount, unlike materials, does not vary directly with production. Among these labor is one, at least in House A, with inclined retorts, since the same crew will make a varying output at the same wages. This, Wood says, is not so in House B. It is quite clear that the supposed optimum of Little is far beyond any practical possibility and should not be taken as a standard. All the plants necessary for the daily "peaks" with reserve must be kept up all the time with some part of their complement, and it is not fair, when seeking a standard, not to credit any particular plant with so much idle time as all the company's plants must collectively bear.

Under the heading "Present Capacity and Reserve" I have considered this matter, and show that it is impossible to say that the company has too much capacity. It is, of course, always possible to show that a given plant was worked less than the average—e. g., the Fourteenth street and Forty-Second street plants—and that its costs should not, therefore, be accepted as a guide; but that is not the case with either House A or House C. In 1918 the company's total production, leaving out Fourteenth street and Forty-Second street and gas bought, was 17,599,323 thousand cubic feet. Its daily rated capacity was 84,-000 thousand cubic feet, a total for 365 days of 30,660,000 thousand cubic feet. The production was 57 per cent. plus of rated capacity. During that year the production of House A was 52 per cent. minus of capacity, and of House C 61 per cent. minus. For the 8 months of 1919 the total was 58 per cent. plus,[3] for House A 76 per cent. plus and for House C 58 per cent. minus. Thus it appears that, taking both years together, these houses were kept at about normal production.

I think it would be impossible to say whether this would account for the whole difference between Little's figures, corrected for materials, and the actual results at House A and House C. That would require accurate knowledge of what is the difference of complement between full and part capacity production. However, it is clear that there would be some difference, and that in any case Little's figures, necessarily based upon purely hypothetical conditions, may not fairly be taken against the actual practice, which came so near to them in results.

If I take Sangster's figures for 1918, I find the cost of coal gas at House A was $.31537; the cost of water gas at House C, $.39843.

[3] Without deducting Fourteenth street and Forty-Second street, which I do not find, but which is too small to change the result.

Taking the proportions at 22 per cent. to 78 per cent., and half and half, and allowing 4.1 per cent. for loss, I get $.3964, or $.3723, respectively, for these figures.

### Distribution Expenses.

These expenses are made up from the books of the company, which I have already held to be good prima facie proof. Various items are challenged, which must be taken up seriatim:

(a) *Repairs to Meters and Appliances.* These are not done directly by the company, but by the Standard Company, a subsidiary, whose stock is owned by the plaintiff. They are billed to the plaintiff, and all items are scrutinized and checked by one of its officials. Presumably the charges include a profit based upon the assumption that the companies are independent, for so the accounts read. In the case of mains and services the plaintiff does the work for the other companies and charged a profit of 5 per cent. I have not been able to find what the Standard's profit is on this work, but it is scarcely necessary in the case of so small an item. If I assume that the profit was 10 per cent., as it is on the sales of gas between companies, there would result a deduction of $29,322 for 1918 and $24,120 for 1919. I shall so take it.

(b) *Repairs to Mains and Services.* These were done by the company, for itself and all other companies. No profits are included, and the item should be taken as it reads.

[7] (c) *"Promotion Expense for Gas Appliances"* (d) *"and for Gas Utilization."* These items include the cost of maintaining these departments, which the company organized some years ago to push the sale of gas and of machines to burn gas. Their propriety is challenged largely because the sales have not increased much. The truth appears to be that the constantly increasing use of electricity for illumination has driven out gas more and more, until to hold its sales the plaintiff must promote the use of gas for heating and cooking. It has succeeded in a slight increase of sales, and its officers attribute their ability to do even so well to these departments. I have no doubt that they are right; but, whether right or wrong, their decision is not now open to question. They were under a duty to keep up their sales so far as they could, and to push the use of gas in any new ways which the public would use it. Even under municipal management, advertisement, when not pushed to the useless extreme which competition too often engenders, is a necessary function. In its proper sense it means, not the creation of a factitious demand by the familiar processes of repeated suggestion, but genuine information in such form as to reach the public.

(e) *Salaries and* (f) *Supplies at General Office.* The salaries of the general officers should be apportioned, as the master recognized and the defendants claim; but it is very hard to find any satisfactory theory on which to allocate them. Obviously it is impossible to learn what part of his time each officer gave to gas or "non-gas" business. The method suggested of dividing in accordance with the income has few advantages, except that it is an intelligible theory, and has at least some relation to the facts. I shall adopt it, but only because

I am taking all doubts against the plaintiff. The same applies to the transfer, accounting, and cashier's departments. In the engineering, commercial, purchasing, and chemical departments there can be no ground for any allocation at all. All this work presumably went for gas manufacture, and so much of it as was expended for other companies appears to have been charged against them in the books. Mr. Woods did not apparently keep exact track of his time, but the portion of his salary to be allocated is very trifling. I shall accept those items.

The rest of the charge it is hopeless to attempt exactly to apportion. I shall assume that it was shared between all the foregoing departments in the proportion of their salary accounts, and I shall deduct one-third of that part attributable to the general offices, transfer, accounting, and cashier's departments. The result of this, as I make it, is $77,122 for 1918 and $53,837 for 1919.

(f) *General Office Supplies and Expenses.* I apportion these, very roughly it is true, by deducting that percentage of the whole which the deduction from the preceding item bears to the whole item; that is, I deduct $23,509 for 1918 and $15,361 for 1919.

(g) *Charges to United States for Officers' Services.* This item does not appear on Exhibits 364 and 365, from which I calculate the cost of distribution. I need not consider it.

(h) *Legal Expenses.* I think these should follow general officers' salaries. I deduct $14,183 for 1918 and $13,300 for 1919.

(i) *Insurance.* The insurance item covers, not only some property not used in the gas business, but the Fourteenth street and Forty-Second street plants, which, as will appear, I am eliminating from the "rate base." These items should come out, and the means of adjusting the item on that basis has not been pointed out. The defendants claim a deduction based upon the income which has been earned by the insurance funds and upon the insurance participation certificates. These certificates are issued to the plaintiff merely as evidence of the surplus in any year of the premiums over losses. It does not appear that subsequent premiums may be paid by their redelivery, but possibly this is true.

In view of the fact that the insurance premiums include property not used for gas purposes, I think I should accept the defendants' demand on this item, $17,148 for 1918, $17,481 for 1919.

[8] (j) *Mutual Aid Society and* (k) *Superannuation.* Under these two items are charged those payments, now very common among large corporations, by which the employés receive insurance for sickness or distress or a pension when aged. There can be no question of their propriety in substance, nor can I, with deference, agree with Kings County Lighting Co. v. Lewis, 110 Misc. Rep. 204, 230, 180 N. Y. Supp. 570, that the charges may not be made during the years when the disability existed. The method to be adopted is fairly open to the discretion of the officers, and in the end it makes very little difference how it is distributed among consumers. The question is whether it is in fact paid and represents a reasonable amount.

In the latter question the master peremptorily shut off any inquiry in the case of superannuation. He assumed that the discretion of

the officers was not subject to review, and in this he was in error, because, if that discretion had been wanton or extravagant beyond reason, it could not stand. However, all the details were contained in certain bundles of papers which the defendants themselves put in evidence, and which showed what each allowance.had been and to whom made—at least so I understand, though the exhibits have not been submitted here. I cannot see that the cross-examination, which the master stopped, could have added anything of substance. The officers examined would scarcely have admitted that they considered the allowances too great, and the only available proof would have been by showing that in other companies such allowances were so much smaller than those actually allowed as to make them extravagant. This the defendants did not offer to show, and no doubt could not. I do not think, therefore, that the master's erroneous ruling should throw out this item.

(1) *Automobiles.* The plaintiff uses 20 passenger cars in its business, of which 7 are detailed for the use of its officers. The point was raised that this number was too many, and the superintendent in charge of the department was called by the defendants, apparently to establish the point. The resulting examination really goes very little into that issue, and was directed for the most part to the method in which the accounts were kept. The master allowed very few questions upon that, and of this the defendants complain. I cannot see that the examination shut off was of any consequence upon the relevant issue; at least, the defendants stated no reason to the master justifying his so supposing.

As to the necessity of having 7 cars, I will rule here, as elsewhere, in the absence of some evidence showing that they were unnecessary, or that the officers abused their powers by using them for personal purposes, that their judgment must stand prima facie. As in analogous situations, given the discretion, its exercise must be shown to have been injudicious. I allow the item.

[9] (m) *Interest on Consumers' Deposits.* In whatever way figured it seems clear that this is in no sense a proper item in the cost of distributing gas to the consumer. I am not trying to learn what were the revenues of the company in the past, but to establish a basis for the cost of distribution in the period to be covered by a decree. I disallow this item, $40,905 for 1918 and $33,601 for 1919.

(n) *Defensive Emergency Service.* This was certainly an exceptional expense caused by the troubled period of the war. It offers no just basis of inference for the costs of distribution in the future. I disallow the item, $100,251 for 1918 and $11,654 for 1919.

(o) *Miscellaneous General Expenses.* Under this heading the defendants challenge a number of items, which are too many and too small to deserve much notice. All of them are proper enough on their face, except the general item of "Miscellaneous Expenses," $27,-280 for 1918 and $8,654 for 1919. In 1918 about $9,000 seems to have been connected with emergency defense. I will deduct $10,000 in 1918 and in 1919 $4,500, two-thirds of what apparently represented Kenney's emergency defense services in 1919.

In 1919 there is an item of $46,320, which comprises the expenses of this litigation. It can hardly be considered a normal charge for each year, and should be spread. I may assume one such suit in 10 years. As we have two years to consider I will deduct $41,688 from 1919 and add $4,632 to 1918.

The sum of these deductions is as follows: For 1918, $317,808; and for 1919, $215,542. The total costs of distribution for 1918 were therefore $3,249,337 and for the first 8 months of 1919 $2,-370,309. The rate per 1,000 cubic feet for 1918 was $.1802, and for 1919, $.1934. A question arises, as to this item, whether the spread should be taken at the actual production during the years in question or at the supposed production in the future, say 20,000,000,000. A few of the constituent factors, like repairs to mains, would seem to be pretty certainly constant, whatever the production. The greater part of them, however, will vary generally with the amount of business done, and in view of the severe treatment which I have given to many of them it seems to me only fair to take the spread at the actual output. There can be little doubt that at any prices now in sight the sum allowed is inadequate.

(p) *Maintenance of Conduits from Astoria.* Connected with the subject of distribution costs is the expense of keeping up the conduits from Astoria. There are two tunnels running between Long Island and New York, one called the "Astoria tunnel," from the Astoria plant to the Bronx, which cost $5,178,614.58; the other further south, and from the New Amsterdam Company's plant to Manhattan, and called the "Ravenswood tunnel." These are each used to conduct gas from the Astoria plant to the plaintiff's mains; the plaintiff being the sole consumer of Astoria gas. The lower or Ravenswood tunnel is used to convey coal gas which has been enriched by oil at Ravenswood; it is small and cost $700,000. However, to reach it the gas must pass through mains on Long Island valued at $844,422.71.

All these conduits are formally owned by the East River Gas Company and are used by others than the Astoria Company. The several corporations have adopted a figure of 57 plus per cent. as representing the plaintiff's proper share of these conduits, based upon their relative requirements. They have also adopted somewhat arbitrarily the figure of 3½ per cent. as proper for the renewals and repairs necessary for upkeep; the figure being taken from calculations made by the company's engineers by an average over a number of years. There was no apparent motive in fixing it at that amount, except a desire for an honest apportionment of charges between them, even though it were for bookkeeping purposes. Had the defendants wished to meet this proof, the actual vouchers were available for them to do so. The estimate under the circumstances seems enough to make a prima facie case, but against any possibility of error I will take it at only 2 per cent.

However, it appears to me a closer estimate not to take the full valuation of the Astoria tunnel and leave out the Ravenswood and the connecting lines. It is better to treat the whole system of conduits between Astoria and New York as one and to take a percentage of the whole. Past experience indicates 57 per cent. plus, but I shall give my

reasons in considering the "rate base" for taking it higher and allowing $4,400,000 as the proper allocation. At 2 per cent. the repairs figure $88,000, which on a spread of 20,000,000,000, which it is proper to take on this item is $.0044. With the other distribution cost, the total is $.1846 for 1918 and $.1978 for 1919.

### Taxes.

The company has calculated its own taxes, and both sides start with that calculation as a basis (Exhibits 205 and 355).

(a) *Gross Earnings Tax.* The first item, New York state gross earnings tax, is apportioned in accordance with the division of income between gas and "non-gas" business. This is fair, and I do not understand it to be challenged.

(b) *New York Special Franchise Tax.* The next item is the special franchise tax. This is a tax based upon the value of the property in the streets, together with the right to use the same as a public utility. It is, of course, plain that, if franchises proper are not to figure in the "rate base," so much of this tax as is figured on franchise as against the value of the mains and the like is improperly levied. The state should not at once levy taxes on the basis of a supposed value in the franchise and refuse to recognize that value as property on which any income may be earned. But, at least while the state continues to do so, it must be content to allow the sums paid to be a credit in the account.

The only question, therefore, is of the proper allowance for the franchise tax. In 1918 these were assessed at $384,297, and in 1919 $190,658. There would be no difficulty in allowing these sums, were it not that the assessments have always resulted in contests in which the company has never but once paid the full assessment. It therefore becomes necessary to conjecture what the proper credit should be, and obviously the only basis is past experience. Between 1906 and 1914 exclusive settlements have been made on the average at the rate of less than 64 per cent. But in 1915 the full amount was paid, and in 1916, 1917, and 1918 the amounts already paid are a little less than 70 per cent., and it can scarcely be assumed that nothing more will ever be paid during these years, and it would probably be unfair to credit the company with only 70 per cent. in the future in fixing a rate. Nevertheless, I shall do so for the purpose of this case, and allow the item in 1918 at $269,000 and in 1919 at $133,460.

(c) *Real Estate of Corporations Tax.* This is a tax levied upon the "tangible" property in the streets of New York, and, if the special franchise tax is valid at all, this property has already been once assessed and taxed. There is, indeed, an apparent injustice in disregarding a tax levied by the state in a case to which the state is in effect a party, yet there is an equal apparent injustice in crediting the plaintiff with a tax which it insists it will never have to pay, and which it will not pay if it pays a special franchise tax. In such a dilemma the burden of proof must determine the issue and the item must be disallowed.

267 F.—17

(d) *Real Estate Taxes.* Only those taxes on property held to be used and useful should be credited. Referring forward to my calculation of the "rate base," I deduct the following items:

|  | 1918 | 1919 |
|---|---|---|
| Block 982, lot 13.......................................$ | 8,425.20 | $ 5,521.60 |
| Block 988, lot 1........................................ | 35,813.00 | 23,470.67 |
| Block 1089, lot 1....................................... | 57,938.00 | 39,053.33 |
| Block 1090, lot 23...................................... | 1,433.70 | 957.00 |
| Block 1107, lot 7....................................... | 9,440.00 | 6,186.67 |
| 56 per cent. of block 985, lot 7........................ | 2,814.56 | 1,844.60 |
| 5 per cent. of block 989, lot 1......................... | 528.05 | 346.05 |
| 10 per cent. of block 1457, lot 6....................... | 1,699.20 | 1,113.60 |
| One-third of block 3236, lot 1.......................... | 8,016.00 | 5,804.00 |
|  | $126,107.71 | $84,297.52 |

(e) *Personal Taxes.* The defendants' challenge as to personal taxes extends only to 1918, and rests upon the fact that the personal tax for that year was assumed to have been levied on gas property only, because that was done in 1919. The inference appears to me legitimate. I allow the item.

(f) *United States Government Taxes.* This item is not challenged.

(g) *Interest on Taxes.* The plaintiff very ardently argues that it should be allowed a credit of interest accruing on unpaid taxes. Except in the case of special franchise taxes, it is hard to see any justification for such a credit. Nor does the case seem to me different as to them either. The only theoretical credit that I can see is the difference between the interest due upon so much as they will in the end pay and the value of the money in their hands meanwhile. In the first place it is impossible to tell what they will pay; if it were not, I should credit them with it; and in the second it would be a mere conjecture what was the value to them of the money in their hands.

The allowable taxes on the plaintiff were therefore for 1918 $831,-645.08, and for 1919 $468,092.97.

(h) *Astoria Taxes.* (1) *Real Estate.* In 1918 the Astoria company paid $264,700.15, and in 1919 $307,819.36, which should be prorated for 8 months at two-thirds, or $205,212.90. (2) *Personal Estate.* 1918, $11,157.41; 1919, $7,666. (3) *Special Franchise.* 1918, $321.-73; 1919, $210.92.

(i) *Conduit facilities.* As has been seen, the total investment in these conduits was $6,722,037.29, of which I credit the plaintiff with 65 per cent. for reasons given later. Taking taxes at 2½ per cent. on an assessment at say two-thirds of its value, or $4,500,000, the tax will be $112,500, of which 65 per cent. is $73,125 for 1918 and $48,-750 for 1919.

(j) *New Astoria Plant.* There must for the future be figured an increased Astoria tax, based upon the new plant now in process of erection, all of which I am allowing for reasons which will appear. The cost of that plant will be $4,500,000, and if I take the assessment at two-thirds, there will be added to the assessment $3,000,000, on which the tax at 2½ per cent. will be $75,000 for 1918 and $50,000 for 1919. The total taxes, therefore, will be as follows:

| | 1918. | 1919. |
|---|---|---|
| Consolidated Gas Company | $ 831,645.08 | $468,092.97 |
| Astoria (present plant) | 276,197.29 | 213,089.82 |
| Astoria (new plant) | 75,000.00 | 50,000.00 |
| Conduits | 73,125.00 | 48,750.00 |
| | $1,255,967.37 | $779,932.79 |

Taxes can hardly be thought to vary in proportion to production, and the proper spread should be the supposed sales to be effected within the period of the decree. I have taken these at 20,000,000,000 throughout. The tax factor is therefore for 1918 $.0628, and for 1919 $.0585.

### Federal Income Tax.

The company has hitherto escaped any federal income tax, because the United States authorities have accepted its statement that it has no net income. However, this case proceeds on the supposition that an income must be allowed it, and into the calculation of a fair profit that factor must surely enter, if the company is to be upon a level with freely competing industries. At present under the Revenue Act of 1918—section 230a (2) (Comp. St. Ann. Supp. 1919, § 6336⅛nn)—the tax upon corporations is fixed at 10 per cent., and would amount to the following sums. Assuming a capital of $64,000,000 without franchises, and $72,000,000 with franchises, and profits at 6 per cent., or 7 per cent., the results are as follows:

| | Six Per Cent. | Seven Per Cent. |
|---|---|---|
| Including franchises | $432,000.00 | $504,000.00 |
| Excluding franchises | 387,000.00 | 448,000.00 |

On a spread of 20,000,000,000, these figures would become for each 1,000 feet of gas, as follows:

| | Six Per Cent. | Seven Per Cent. |
|---|---|---|
| Including franchises | .0216 | .0252 |
| Excluding franchises | .0192 | .0224 |

These figures must clearly be allowed. In fact, the calculation should be higher, since the tax will be levied upon the income without any deduction for the tax itself, but that is a small variation.

### Renewals and Replacements and Gas Storage.

The company has carried on its books an account each year called "Renewals and Replacements," which is in fact an amortization account. Into this is put the loss arising from the abandonment of old plants, arrived at by subtracting the salvage of the plant from its cost on the books, together with the cost of withdrawal. It is possible to obtain a long average of these charges by taking the amount of gas reported sold from December 31, 1907, to December 31, 1918, and using it as a divisor for the sums so carried on the books over the same period. The quotient is $.0373, which the master has taken at $.03. In these cases the conclusiveness of the master's report does not obtain (Knoxville Water Co. v. Knoxville, supra), and I shall use the more exact rate.

I figure the cost of gas storage, based on the years 1918 and 1919, at $.0097. The sum of these items is $.047, which I accept.

### Present Capacity and Reserve.

As a preliminary to considering the "rate base," and indeed as an inevitable element in deciding whether or not I should include the Fourteenth street and Forty-Second street plants, it becomes necessary to take up the company's capacity and reserve, compared with its present demands. If it should appear that any plant is necessary for the reasonable future, that plant must be included, as it is to-day, at least at its value in modern cost of reproduction. If, on the other hand, it appears that there is a reasonable doubt about that necessity, it should be excluded.

The rated daily capacities of the present plants of the plaintiff (including Astoria) are as follows:

| | | |
|---|---|---|
| Fourteenth Street | 5,000 | (coal) |
| Twenty-First Street | 28,500 | (water) |
| Forty-Second Street | 4,500 | (coal) |
| Ninety-Ninth Street | 5,500 | (water) |
| Astoria House A | 10,000 | (coal) |
| Astoria House B | 10,000 | (coal) |
| Astoria House C | 30,000 | (water) |
| Total | 93,500 | thousand feet |

On January 31, 1920, its send-out was 99,243 thousand feet. It is certainly not unreasonable to calculate its maximum send-out at 100 million in the future. The defendants concede that the reserve should not be less than 5 per cent. The plaintiff believes that much more is necessary. If I put the total requirement at 105 million feet, I shall be probably shaving too close for safety, even at the present demand. The master's allowance of 15 million cubic feet out of the 30 million now building at Astoria gives only 8½ per cent. reserve, if the Fourteenth and Forty-Second street plants are included. If they are not included, the capacity is insufficient. It is clear, therefore, that either those plants must be included or more of the new Astoria unit.

The defendants urge that this is the wrong way to approach this subject, there being a whole system which may treat its reserve as one, and I will consider the capacity on that assumption. On January 31, 1920, the maximum of the system was 166,488 thousand feet. Allowing only 5 per cent. reserve, the requirements are 175,000 thousand plus, which the system just has. Its resources at present are as follows:

| | |
|---|---|
| Consolidated and Astoria (as above) | 93,500 |
| New Amsterdam | 36,000 |
| Standard | 10,500 |
| New York Mutual | 24,000 |
| Central Union | 11,800 |
| | 175,800 thousand |

If the two plants on Fourteenth street and Forty-Second street are to be disregarded, the system has no reserve at all. The defendants must therefore either allow these two plants or some part of a new plant, because it is obviously already time to build. But when building a reserve, economy and prudence require a forecast of the future. The construction of a 30 million plant at Astoria decided on in December, 1919, was proper caution; some addition was needed; less would not have been economical. If this be added, and the two old plants are disregarded, the system has a reserve of 18 per cent., and the plaintiff as a member must bear its proportion of that amount; i. e., it must have a capacity of 118 thousand. As it has by hypothesis only 84 million left, it will be obliged to use 16 million for its actual demands, and the balance of 14 million will be less than its share of the reserve. In short, if the two plants are to be disregarded, the whole cost of the new plant must be part of the "rate base."

I do not mean to decide that with the new plant the system has too large a reserve in 23½ per cent., which it will have. I only mean that, since it was good policy when building to build so large a unit, the utmost that can be demanded under the most exacting theory is that, if the old units are to be disregarded, the whole of the new unit must be credited. The only question open is whether the old units ought not also to be included. As I am not fixing a rate, I need go no further in this case than to take the doubt against the plaintiff.

Mr. Little made some elaborate calculations to show that the plants were not worked to capacity, but it is all irrelevant. Even if Astoria could make 57 million feet a day and Twenty-First street 33 million, and Ninety-Ninth street 6 million, the company could not fill its present demands. And if the system as a whole be considered, and these, as I think wholly conjectural, hypotheses be accepted, the total capacity of the system becomes only 177,300 thousand cubic feet, with Fourteenth street and Forty-Second street excluded. This is a reserve above last year's demands of only 10,812 thousand cubic feet, or 6 per cent. plus. It is absurd to suppose that the time had not come, viewed even under Mr. Little's assumptions, in which new building must be done.

For these reasons, in accordance with my plan of resolving all doubts against the plaintiff, I have excluded Fourteenth street and Forty-Second street. I include the whole of the new Astoria plant. It is to be remembered that in so doing the "rate base" is reduced much below what it would be if the new unit had been coal gas plants, which would have cost twice as much. If the proportion of coal gas to water gas had been in this way changed to about 45 and 55 per cent., it would have involved capitalizing this unit at $9,000,000 or $10,000,000 at least. The addition of $5,000,000 to the "rate base" so involved would add $.015 or $.0175 on a spread of 20,000,000,000, according as the rate be taken at 6 per cent. or 7 per cent. This makes the difference in distribution of coal and water gas count for less than 1 cent even on prices in 1918. It adds a reason for disregarding the theoretical division suggested by Mr. Little.

### "Rate Base."

It is possible now to calculate the "rate base," which is composed of the following items: Real estate, plants, conduits jointly used, office buildings, the present Astoria plant, the Astoria plant now building, working capital.

If the plants be taken at their cost, there is logic in insisting, as the defendants do, that the land shall be taken in the same way; but I have, for the reasons already given, refused to do either. The value of the plants is, it is true, calculated upon the basis of cost, but not in any sense because I think cost the test; only because it is clear that at present anyway an estimate based upon cost is a most conservative one, and because it has the great advantage, as I have said, of avoiding conjectures based upon the opinions of experts.

(a) *Land Used and Useful.* The real estate of the Fourteenth street and Forty-Second street plants will come out of the "rate base" along with the plants themselves, for the reasons which I have just given under the heading, "Present Capacity and Reserve." This involves the following deductions:

*Fourteenth Street:*

| | |
|---|---|
| Block 982, Lot 13 | $326,000 |
| Block 988, Lot 1 | 390,000 |
| Block 991, Lot 1 | 180,000 |
| Block 991, Lot 47 | 56,000 |
| Total | $952,000 |

*Forty-Second Street:*

| | |
|---|---|
| Block 1089, Lot 1 | $ 900,000 |
| Block 1090, Lot 23 | 82,500 |
| Block 1107, Lot 7 | 375,000 |
| | $1,357,500 |

I shall take up seriatim the other pieces challenged:

*Block 985, Lots 7, 19 and 20.* This space appears to have been used for storage, and to be deemed necessary by the officers of the company, who think that they have no other available space. There is no sufficient reason to impeach their judgment. Nevertheless the westerly half of lot 7 is occupied at present by two small holders and a boiler house. It is hard to see any use for them, and no prospective use is suggested. I strike off $100,000 at an estimate, or 56 per cent.; the western half must be the more valuable.

*Parcel 2, Lot 1, Block 989.* This easterly parcel contains a boiler plant and pumping station used in connection with two holders, one of the plaintiff, for 32 million feet, and the other of the New Amsterdam, for 5 million feet. It seems that this should be prorated in that proportion between the two. The book cost to complainant seems to have been $20,643.84. I strike off three-eighths of $20,643.84, or $7,740.

*Lots 29 and 30, Block 952.* Lot 30 is an old machine shop used for storage purposes, 70 by 60 feet. In the summer of 1918 there was little

in it. Lot 29 is vacant and used for storage. The company asserts that its storage facilities are small. I do not think there is any sufficient reason to upset the discretion of the officers in retaining these lots.

*Part of Lot 6 of Block 1457.* This is a very small matter, but the lot seems for long to have remained unused, and an apportionment may be proper. I will strike off $15,000 for this lot; some estimate must be made, and it will inevitably appear arbitrary under the circumstances.

*The Westerly 300 Feet of Lot 2 of Block 1157.* This was formerly the site of six small holders; the westerly end of the lot being occupied at present by two 4,000,000-foot holders. This is an expensive piece of real estate, and it is not likely that the company would hold it unoccupied, if it had no genuine prospective use for it. There is at most a great difference of competent opinion as to the relation between the maximum output and holder capacity, and the officers of the company were not obliged to accept the figure of 75 per cent. suggested by Hine. Little figured it at 150 per cent. of maximum capacity, which the company has not. The property has been unused for only two years, and I think the time has not yet come when the company must make up its mind whether it will sell it or put up new holders. I decline to interfere with their judgment as to this property.

*Lot 18 of Block 1683, Lot 2 of Block 1712, and the Easterly 281 Feet of Lot 5 of Block 1705.* The first of these, so far as the evidence shows, is used for a training school. Lot 2 of block 1712 is most essential, as it gives access to the East River. The larger part of this property is used for the Astoria Company, and, in view of the way in which the case has been treated, there is no reason to distinguish between it and the plaintiff. The easterly part of lot 5, block 1705, is used for various purposes, part of them being in use by the National Coal & Coke Company. As the revenues of this company are charged against the plaintiff, no injustice is done in allowing the whole property as in its "rate base." Strictly, perhaps, the item should be set off, but the difference is too trivial for notice.

*North End of Lot 1 of Block 3236.* Upon the south end of this lot is built the 10,000,000-foot Kingsbridge holder. This purchase was made after considerable public feeling had been manifested in that part of the city, and as a concession to the citizens by the company, which was properly made. It was necessary at the time to buy the whole tract, and the portion now criticized is in the market. I think it unreasonable to require the company to attempt any residential development of the northern part, owing to the character of the land itself. It is true, however, that they have kept it unused for 10 years without sale. It seems to me that a time has come when the sale should be made, at least as an alternative to keeping it a part of the property on which gas profits can be made. If I take off one-third of the value, say $70,000, I shall certainly not be unfair to the defendants.

These are all the prices questioned of those which the master allowed. The total deductions for the sum he awarded, of $9,531,275, are as follows:

Fourteenth Street ...........................................$ 952,000
Forty-Second Street ........................................ 1,357,500
Block 985, Lot 7............................................ 100,000
Block 989, Lot 1............................................ 7,740
Block 1457, Lot 6........................................... 15,000
Block 3236, Lot 1........................................... 70,000

    Total .................................................$2,502,240

                                                          $9,531,275
                                                           2,502,240

Leaving a balance...........................................$7,029,035

(b) *Reproduction Value of Plants, estimated from their cost.* The books of the company show the cost of all its plants and the summaries in evidence go back to 1884, when it was organized. I have taken only those plants which remain open on the books and not all of these. The figures as of December 31, 1918, are as follows:

| Stations | Book Value. | Part of Plant Condemned. |
|---|---|---|
| 21st St. station (plant) ......................... | $3,816,273.52 | |
| 44th St. station................................. | 2,004,996.31 | $1,290,412.67 |
| 63d St. station.................................. | 401,204.48 | |
| 65th St. station................................. | 817,105.37 | |
| 99th St. station (plant) ......................... | 1,158,402.97 | |
| 111th St. station................................ | 1,085,862.26 | |
| Kingsbridge holder.............................. | 912,299.04 | |
| 132d St. station................................. | 475,896.74 | |
| 132d St. testing station......................... | 7,450.00 | |
| 14th St. holder as adjusted...................... | 584,485.20 | |
| Engineering item................................ | 323,907.59 | |
| Total ......................................... | $11,587,883.48 | $1,290,412.67 |
| Deduction for part of plant condemned.......... | 1,290,412.67 | |
| | $10,297,470.81 | |

Hine's figure for these items is $9,979,935.72, which varies in substance only as to the 111th street station. That difference arose from his exclusion of blocks 1704 and 1712 and 1683 as not used and useful, in which I do not agree with him, as I have said.

The books also have corresponding figures for meters, mains, and services, constituting the whole fixed plant of the company. The whole account for plants, etc., can therefore be stated as follows:

Plants .....................................................$10,297,470.81
Meters, etc................................................. 6,631,454.32
Mains ..................................................... 11,027,266.54
Services ................................................... 1,272,241.74

    Total .................................................$29,228,433.41

This calculation makes no allowance for depreciation, although the method by which the present value is reached is from original cost, which, as I have said, should always bear that factor in mind, even though it need not necessarily include it, when the plants have been kept up. Depreciation Maltbie and Hine figure at $6,507,400, and the

answer at once occurs that it is from any point of view more than met by the increased costs of present reproduction. Such, indeed, is the evidence so far as mere opinions and calculations of experts can justify a conclusion. Besides, there is a check, curiously conclusive at least to me, upon the cost of the plants. As I have said, the Astoria plant of 30,000,000-foot water gas, now building, will cost $4,500,000 to be completed by December of this year. The contract was let in December, 1919, and forms a good test of what the costs then were for such units, better, probably, than the opinions of witnesses. It is a fair inference from that contract that the cost in such large units was not less than $1,500,000 per 10,000,000 feet capacity, and so Addicks takes it. The capacity of the only two water gas units on Manhattan is 34,000,000, making at such rates a cost of $5,100,000. The book cost is a little short of $5,000,000, a surprisingly close parallel. Therefore, judged upon the basis of their present capacity, I may assume that the reproduction value of the Manhattan plants is at least their book value. It is, of course, true that in so doing I have not made any discount because they are old. I have taken the standard to be the cost of fixed capital sufficient to render the service in question and for the reasons already given. Maltbie figured a "straight-line" depreciation of $3,500,000 for all plants and holders. This was necessarily a conjecture, based upon the supposed life of the plant; it has no application while the plant is kept up. It is quite true that there is no such check upon holders and stations as in the case of plants; but, on the other hand, so far as opinion evidence can show, it appears without contradiction that to reproduce these would now cost a great deal more than their book cost.

The other elements of depreciation are for mains, about $1,500,000, and services and meters, $1,500,000. Any depreciation in the mains appears to me quite fanciful. Little said that the life of a main, when properly buried, was indefinite; the only question is of obsolescence and repairs, and I should suppose that obsolescence would occur only after it got too small for its requirements. It might, of course, be possible to show that all necessary mains could now be laid for less than the book cost; but the plaintiff has shown the contrary by Miller, and it is not contradicted.

As to meters and services the case is not so strong, because, even if their life be 75 years, as Little thinks, no one knows the age of all those in use. Moreover, the depreciation of $1,500,000 is only about 12 per cent. of their cost. However, the same rule applies as before. The plaintiff proved the cost and the necessary repairs to bring the whole plant up to its original condition. It proved that the cost of reproducing fixtures of equal capacity was more than the book cost. That made a case in my judgment which was proof against any theory of "straight-line" depreciation. The allowance for repairs might be attacked on the ground that the condition of the plants and fixtures in fact required inordinate repairs, but that was not done. In accordance with the principle which I have tried to demonstrate, I decline to make any allowance for depreciation.

(c) *Conduits Jointly Used.* I have already given my reasons for taking all the conduits used by the Astoria company rather than the Astoria tunnel alone. For the rate base the figure is 57 per cent. of $6,723,037.29, or $3,832,131.25. However, since the Fourteenth street and Forty-Second street plants are excluded, it is hardly fair to count only 57 per cent. of the value of these conduits as allocatable to the plaintiff. I must assume that all the gas used by it will come through one or the other of these conduits, except what can be made at Twenty-First street and Ninety-Ninth street. This would very substantially increase the proportionate use of the tunnels, but it would be hard to say exactly how much. In taking the valuation at $4,400,000, which is 65 per cent. plus, I should be within a safe estimate, and I so take it. I am supposing the Astoria capacity to be raised from 50 to 80 million cubic feet a day.

(d) *The General Office Building and the Fifty-Seventh Street.* In 1914 the company erected a very large office building in New York as a place of business, not only for itself, but for its allied companies, including the Edison Company. This is 19 stories in height, and contains, besides offices proper, many adjunct rooms, such as an auditorium, a restaurant, telephone booths, and other conveniences, not only for the needs, but for the rest and pleasure, of the tenants. Its cost was $2,542,615, and the value of the land was $410,000, making an investment of $2,952,615 in all. In view of the fact that the greater part of this building was not used for gas purposes, it became necessary to apportion the space between the company and its other tenants. Estimates were made as of various dates, the last being July 1, 1919. At that time the company's occupation was claimed to be 113,785 square feet (including its share of the common conveniences), out of a total of 294,445, 38 per cent. of the whole. The question, as I view it, is only how much of the investment can properly enter into the rate base. Dr. Weber did, it is true, figure the total rentals of the property and charge them against the plaintiff; but that would not be gas income anyway. I need only find the amount of the building properly allocable to gas business for use in the "rate base." Strictly speaking, a portion of the upkeep should also be credited to costs of distribution; but that is either included in another item or has been omitted. It can hardly be of much consequence. I shall therefore consider only the apportionment in determining the "rate base." As such, in view of the fact that the company has claimed only about 35 per cent. of the whole, the time and testimony spent upon it were hardly justified; at that percentage it would only bring into the "rate base" a little over $1,000,000.

Some allowance, of course, must be made; the defendants wish me to strike out 80,000 square feet actually occupied, leaving only about $255,000 in the "rate base," which is most unfair. Still the impossibility of precise allocation in any event, the estimate at best resting in supposition, requires a rough estimate. It is agreed that the Edison Company has 1,600 employés in the building, and the plaintiff 800. The total space, including that assigned for the common conveniences, assigned to the Edison Company, was 123,631. If I divide this in half,

and then add something, in view of the fact that the higher paid employés of both companies get a larger space in any event, I can safely allot 70,000 square feet to the plaintiff. This would leave 43,785 square feet of the building unoccupied, on the theory that the plaintiff's employés might be less spread out than they ai :. But the building was rightly built for the future, and I shall assume that the space so theoretically vacant will be occupied in the future in the same proportions as that now occupied. I find, also, that that extra space was prudently built in 1914. In short, I shall deduct it from the total space, and so give the plaintiff a percentage of 28 upon the whole investment; i. e., $846,732.20.

The Fifty-Seventh street building was built as another office in 1918, and is used only by the company. The question was debated, and advice taken upon it, whether it should be a high building or not, and after consulting competent real estate brokers it was decided to build a low building. The defendants complain because that advice was followed. I decline to harry the company with such factious vexations; their discretion may or may not have been right, but there is no ground to say that a clear error was made.

As to the site, the company had the right to build upon a thoroughfare, not on a side street. The public convenience justified it in having its quarters where they would become generally known; it might also have an eye out to the advertisement from such a location. Municipal authorities wisely select such streets for their enterprises. I allow the sum: Land $400,000; building $294,718.47. The total of these is $1,541,450.57, to be added to the rate base.

(e) *Present Astoria Plant.* The present Astoria plant was begun in 1906, and there had been expended up to October 31, 1919, $15,497,615 upon land and fixtures. This sum must come into the "rate base," unless some part of it is not necessary for gas purposes. The defendants challenge the amount of land purchased, contending that less would have been enough, because much of it is not now in actual use. In 1914, however, when the Astoria company applied for leave to issue $14,500,000 of securities, the Public Service Commission granted that leave, and it appears that the engineers of the commission had tested all expenditures by the vouchers to the extent of 75 per cent. Section 69 of the Public Service Commissions Law authorizes issues only in case the expenditures have been "reasonably required" for the purposes of the company. People ex rel. D. & H. Co. v. Stevens, 197 N. Y. 1, 90 N. E. 60, was decided before the amendments of 1910, and it was clearly stated in People ex rel. B. L. H. & P. Co. v. Stevens, 203 N. Y. 7, 21, 22, 96 N. E. 114, that the commission might withhold its consent to expenditures not in the nature of permanent capital.

There can be no question, I think, that the Public Service Commission could have refused to consent to the issue because all the land was not necessary, and that it is too late now to take a contrary position. At that time the fixed capital account was but a little above the issue authorized. I shall therefore take it that, viewed in the light of prospective requirements and the advancing cost of land, the whole

area is reasonably necessary. I therefore allow the sum as of October 31, 1919.

(f) *Astoria Plant Now Building.* The value of the Astoria plant now building is concededly $4,500,000, and for the reasons already given I include it.

(g) *Working Capital.* For working capital I take $2,000,000, not because I mean to fix any such sum, but as a conservative compromise between the plaintiff's figure of $3,800,000 and Maltbie's of $1,480,000. It is in fact probably much too low, and it is clear that, in spite of his subsequent testimony, Little meant originally to say that there was a fairly constant proportion between working capital and production. His figure of 20 cents, which at that time he gave as a minimum, is twice what I have taken here.

(h) *Recapitulation.* The "rate base" so figured, without any allowance for franchises, is as follows:

| | |
|---|---:|
| Land | $ 7,029,035 |
| Plants | 29,228,433 |
| Conduits jointly used | 4,400,000 |
| Office buildings | 1,541,450 |
| Present Astoria plant and land | 15,497,615 |
| New Astoria plant now building | 4,500,000 |
| Working capital | 2,000,000 |
| | $64,196,533 |

This "investment" therefore comes on a basis of 19,000,000,000 feet to a capitalization of $3.36 per 1,000 cubic feet, or $3.63 with franchises included. This is certainly too small. Little swore that in 1914 it was the consensus of engineers that a water gas plant would cost $2.80, and that the present costs would be double that amount, or $5.60. Coal gas plants are much more expensive. It is more than probable that the plaintiff's whole investment is therefore properly valued at $130,000,000 at present prices, or twice what I have valued it at. But I go along with the master, since the result is in any case the same, in adopting the piecemeal method of valuation. That might be improper, if a rate were to be fixed.

### Account Stated of the Plaintiff with the Rate.

I am now in a position to state the account of the plaintiff with the rate, taking the revenues as $.7991 for gas sold and $.073 for other gas revenue, $.8721 in all; $.073 is higher than either in 1918 or the first 8 months of 1919. It is $.0002 lower than the 12 months ending October 31, 1919.

1918.

| | |
|---|---:|
| Cost of production | $.3964 |
| Cost of distribution | .1846 |
| Taxes | .0628 |
| Renewals and storage | .0470 |
| | $.6908 |

| | |
|---|---:|
| Revenues | $.8721 |
| Expenses | .6908 |
| Available for profits | $.1813 |

1919.

| | |
|---|---|
| Cost of production............................................... | $.4519 |
| Cost of distribution............................................. | .1978 |
| Taxes ........................................................... | .0585 |
| Renewals and storage............................................ | .0470 |
| | $.7552 |

| | |
|---|---|
| Revenues ..................................................$.8721 | |
| Expenses ..................................................  .7552 | |
| Available for profits..................................$.1169 | |

Upon a supposititious 20,000,000,000 spread, the income on 1918 costs would be $3,626,000, which must bear a federal income tax of 10 per cent. The net would be $3,263,400. On 1919 prices the net income would be $2,104,200.

I may now determine in percentages the possible earnings of the plaintiff upon four different hypotheses: The costs of 1918, with and without including franchises, and the costs of 1919, under the same alternatives.

| | 1918 | 1919 |
|---|---|---|
| Excluding franchises................................... | 5.08% | 3.28% |
| Including franchises.................................... | 4.53% | 2.92% |

Such is the final result, and so it appears that, even though the "tangibles" of the company are valued, not on the estimates of experts, but on their cost, except in the case of the land, the company will not much more than earn upon them 5 per cent. on the basis of 1918 costs, or 3¼ per cent. on the basis of 1919 costs. If the franchises are added, the earnings will be 4½ per cent. on the basis of 1918 costs and 3 per cent. on that of 1919. As the 1919 prices have now obtained for over a year and a half, it is fair to say that, in a long enough future to call for some relief, the company cannot earn more than 3¼ per cent. on its "tangibles" alone. I doubt very much indeed whether on the present value of the "tangibles," as gathered from estimates of the most competent persons available, which is really the only way in which it can be reached at all, the company can earn more than 1½ per cent., though such estimates are of course somewhat speculative.

This result was indeed to be expected. It is scarcely possible that a rate fixed in 1906 to give a fair return, and presumably no more than a fair return, should to-day be adequate. In the figures I have used I think it clear that everything has been pared down unsparingly, and I take this occasion to say what I have already alluded to more than once already. It would be most unfair to accept any of these figures in fixing a rate. The attitude of a court is very different; it does not try to do justice between the company and the public, but only to see whether the actual rate can by any possibility still be a fair rate. In so doing it must take everything in favor of the rate. It would be the height of injustice, if, in view of that attitude, its conclusions so reached were treated as a fair basis for fixing a new rate. Furthermore, I have not hesitated to cut more ruthlessly in this case than if the result had been closer.

I conclude that the statutory rate has become unfair, and violates the Fourteenth Amendment while present prices continue. The defendants must be restrained for the present from enforcing it, and such a decree will pass.

### Exceptions to the Master's Report.

I am somewhat embarrassed as to how to deal with the exceptions filed. I have not found it necessary to consider in most cases what were the actual facts, but only whether with every allowance they could support the rate. Nor do I think it necessary to go through all the multitudinous exceptions and make a finding on each one. I decline to do this, because in Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, the Supreme Court has said that in rate cases a master's findings, even when confirmed, will not have the effect they usually do, but will at most be persuasive. This I think relieves me of the necessity of passing on each exception, since it would be without legal force. The two opinions of the master and myself show the extent of our agreement and difference, and so far as the findings have any persuasive effect, when I agree with them, that appears. In general they may be regarded as overruled, in so far as my opinion varies from his, and otherwise sustained.

### Form of Decree.

Strictly the decree should merely enjoin the defendants from enforcing the statute and leave the plaintiff to fix such rates as it may choose, collecting them until the state takes some further action. That result I am unwilling to accept, because it relieves the company from any regulation meanwhile, and exposes the public to its estimate of what a fair rate should be. On the other hand, owing to the casus omissus in the law, by which the Public Service Commission has no authority to fix rates above the statutory maximum, I cannot avoid this result, unless I fix a rate myself, or provide what I shall describe in a moment. No one suggests that I have the power to fix a rate, and obviously I have not. It is a prerogative of the Legislature, delegated usually to the Public Service Commission.

But, as an injunction is discretionary, it is possible to annex equitable conditions to it, and this I should do. The Legislature will meet on January 1st, and can readily give power to the Public Service Commission, or can fix a rate itself, and it appears to me that the proper course is to anticipate that action; that is to say, I think conformity with the state law is best secured by making the rate, when fixed either by the Public Service Commission or the Legislature, relate back to the date of this decree. This is a very simple thing to do, because the moneys collected in excess of 80 cents must in any event be impounded pending an appeal, and the appeal can hardly be determined until after the Legislature has had an opportunity to act. I have therefore provided that the special master appointed by the statutory court, who is to receive all moneys over 80 cents shall hold the same until a new rate is fixed, but not later than March 1, 1921, and shall distribute them as though that rate had applied from the date of the decree.

Moreover, in spite of the plaintiff's liability, so established, ultimately to account for any sum now collected, I think that there should be some limit placed upon the sum now to be collected as security.

This sum is the utmost that the plaintiff can ever receive for the period and it should cover any rate which is within reasonable expectation. Just as, when deciding whether an actual rate is invalid, a court must take all doubts in favor of the rate, so, when fixing a security, it should take all doubts in favor of the plaintiff's claims. In neither case has its finding any proper relation to the rate which in justice might be established by the authorities; it is concerned only with limits.

Now the master found that the company's profit was not more than $.0473 on a capitalization of $75,000,000. This would mean on a spread of 19,000,000.000 an income of about $900,000. At 8 per cent. the net income should be $6,000,000, requiring a gross profit of $6,700,000, in order to pay income taxes. In short, on a spread of 19,000,000,000, the rate would have to be $1.10 in order to make the profit which the master thought the company should get.

The company's figures are higher. They claim costs of manufacture in 1920 of $.56, and distribution costs of $.23, and taxes of about $.09. This, with the amortization charge of $.035, comes to $.915, and shows a loss of $.0421, or, on a spread of 19,000,000,000 of about $800,000. It does not very definitely appear what the plaintiff claims for its "rate base." It has put in proof that its property is worth $150,000,000, and urges that sum; but I am not clear that it means to demand 8 per cent. on that capitalization. At 8 per cent. that would require a net income of $12,000,000, and a gross, before federal income taxes come out, of about $13,300,000, which, with a loss of $800,000, would be $14,000,000. On a spread of 20,000,000,000 this would mean an advance of 70 cents, not 30 cents, as resulted from the master's findings.

I believe that it is reasonably clear that such an advance will under no circumstances be allowed, and I think it best to accept the master's "rate base" provisionally, with the single exception of adding the full amount of the new Astoria plant. This makes a base of $77,000,000, and requires an income at 8 per cent. of $6,160,000, which, with income taxes, means $6,800,000, and which, with $800,000 loss, is $7,600,000. At a spread of 19,000,000,000 this is 40 cents, making the rate $1.20, instead of $1.10. It appears to me that it is within the bounds of possibility that the rate may be fixed so high when it is, and since the plaintiff must eventually account with the future rate in any event, I think it fair to protect it against the possibility that it may be so fixed. Any hardship to the public appears to me answered by the plaintiff's inability for any period to escape the jurisdiction of the state authorities.

I have provided that, if the state does not act before March 1, 1921, the plaintiff shall have all the fund, and shall be free to charge what it pleases. Such inaction would indicate that the state was contented to leave the matter in that form, if the decree were affirmed. If so, I should, of course, no longer interfere with the plaintiff in its pursuit of its rights. While that possibility is in fact too remote to be really

very practical, nevertheless the decree must provide against all possible contingencies.

## Stay Pending Appeal.

The decree itself fixes most of the questions which will arise pending the appeal. The stay need only provide in addition for the possible period beyond March 1, 1921, before the appeal is decided. Of course, it should not attempt more than to subject the sums impounded to the mandate of the Supreme Court; that court will have before it all the case, and can make such final decree as it chooses.

I file herewith decrees in accordance with the foregoing.

## Supplemental Opinion.

The plaintiff now moves to modify the decree of August 4, 1920, in three particulars: First, the provision for depositing the excess over 80 cents impounded; second, the "retroactive" effect of the new rate when fixed; third, the absence of findings. It also moves to amend the stay by a provision seeking to expedite the appeal.

## Provisions for Deposit of Moneys Impounded.

The plaintiff urges with force, I think, that to impound all the moneys over 80 cents for a period perhaps of a year will cause loss both to itself and to the consumers. It suggests that it have the right to substitute adequate securities. The best that the special master can get on the deposits is probably 3¼ per cent.; the plaintiff, if required to finance its temporary requirements, must pay much more—it says 14 per cent. In any case it will sustain a loss which will profit no one but the banks, so far as appears. I see no advantage in insisting upon impounding the moneys, if adequate security can be otherwise provided. I shall therefore modify the decree, by allowing the plaintiff to deposit with the master, in lieu of cash, Liberty bonds taken at their market value, or any other bonds which are a proper investment by savings banks in New York. These may be deposited with the special master originally, or money already deposited may be drawn out from the banks upon substituting such bonds. The special master will be charged with the duty of calling upon the plaintiff for more bonds whenever their value equals that of the cash for which they are a substitute.

In order to avoid repeated calls for such security, I have therefore provided that the plaintiff shall in each case originally deposit 103 per cent. of the cash, and that when their market value is equal to the cash he shall call upon the plaintiff to deposit additional bonds up to 103 per cent. of that cash. The interest upon these bonds accruing during the period of his possession shall be a part of the fund. Also I will allow the plaintiff to substitute surety company bonds for cash, or to withdraw cash by giving such bonds, on the following conditions: No single company shall give a larger bond than $500,000, or more than one bond. The bond must secure, not only the cash for which it is substituted, but interest at 7 per cent. during the period of its existence, which is to be part of the fund. The plaintiff must be a party to all such bonds, and the surety company one of those

recognized by the rules of this court. Provision must be made for the possibility of delays and extensions of time.

I have required a substantial rate of interest, because the plaintiff will be in effect using the consumers' money. On the one hand, the consumer profits by getting more than he could from the banks; on the other, the plaintiff profits by being relieved from high rates of interest. The rate at which the plaintiff has sold its bonds is 7 per cent. and on short financing the rates are much higher. I think that 7 per cent. should be the rate, even though the plaintiff must pay a premium to get the bond; it will recover back all that the consumers are not eventually entitled to. In result, if I take the plaintiff at its word, the opportunity will remain favorable to its acceptance. Such bonds ought not to exceed two-thirds of the total payments required.

## The Conditions Imposed upon the Injunction.

[10] The second point urged is that I have exceeded my jurisdiction by imposing as a condition upon the continuance of the injunction that the fund deposited as security shall be distributed retroactively in accordance with the new rate then promulgated. The argument is that by so doing I have in effect assumed the power of the New York Legislature, and during this period have substituted a rate of my own making where no rate existed. Of course, if I were to try to impose any such rate by any sanction other than the inducement offered by the injunction, this would be clearly true; it is equally clear that the only sanction is the injunction. If the plaintiff were absolutely entitled to an injunction as soon as the rate became confiscatory, it would also be true that the conditions I impose are unlawful. The plaintiff is not, however, absolutely entitled to an injunction; it is an equitable remedy, and may be refused, except on equitable conditions. Walden v. Bodley, 14 Pet. 156, 164, 10 L. Ed. 398. The rule is of course most ancient and of the widest application. It has in effect been imposed in very similar circumstances. State R. R. Tax Cases, 92 U. S. 575, 23 L. Ed. 663; Cummings v. Nat. Bank, 101 U. S. 153, 25 L. Ed. 903; People's National Bank v. Marye, 191 U. S. 272, 282–288, 24 Sup. Ct. 68, 48 L. Ed. 180.

Norwood v. Baker, 177 U. S. 269, 291–294, 19 Sup. Ct. 187, 43 L. Ed. 443, a special assessment case, is perhaps to the contrary in effect, but only because the authorities were free to make the proper assessment. It is analogous to the situation here, if the Public Service Commission had now jurisdiction to make a rate. In the other cases the taxpayer who assailed the validity of the rate was obliged to pay the proper amount of the tax, in advance, as a condition of relief. In one sense these cases go further than the decree already entered herein, since they involve an assessment and levy by the court itself. In another, perhaps, they do not go so far, because there is now no law applicable to the plaintiff.

If the plaintiff is right, I cannot limit the rate charged in anyway. Once the statute is in abeyance, its rights are unregulated altogether. This is contrary to the practice, at least in this district, of fixing a rate pendente lite. The court must have as little jurisdiction to as-

sume legislative prerogatives on application for temporary injunction as on final decree. If the plaintiff's argument is good at all, it requires me to free it from all limitation as soon as the statute is found confiscatory. That argument proves too much.

There is no doubt that, viewed as power alone, I might absolutely fix a rate as a condition of granting any injunction, and it makes no difference whether that rate lasted six months or six years. Any other and lower rate fixed by the state would of course in effect supersede it, but the condition of the injunction would continue to be legal. If the plaintiff chose to disregard it, it would suffer nothing but the loss of the injunction. It would then have to deal with the state authorities. That rate would be as good if fixed in a final decree as if fixed pendente lite or pending an appeal. But the question of power is one, and the propriety of its exercise another. I recognize that the condition I have imposed is new, but it seems to me the minimal interference with the functions of the state as the rate-making body. The jurisdiction to suspend rates is at best somewhat invidious, and should be limited so far as possible to constitutional requirements as they now exist.. Generally there is in existence a body which can at once assume jurisdiction; that will in such cases serve, but here it will not. Given this circumstance, no better way occurs to me to limit the interference of this court with the action of the lawful authorities.

The plaintiff, however, appeals a little in misericordiam: it says that, having suffered several lean years, it should be allowed a short period of milk and honey. The presupposition is that the rate, when fixed, will be inadequate. Perhaps so, but it is scarcely an argument to which as a judge, and especially a federal judge, I ought to listen. Within the limits which the Supreme Court has laid down, I suppose the Legislature of New York may grant rates which will give questionable inducement to public service companies. They have the power, and, if its exercise prove impolitic, judges have nothing to say. The new rate, when established, must be enough under the rules, or it will be again invalid; short of that, it will stand. One may say, if one likes that form of statement, that it must be presumed adequate till the contrary appears. I decline to change this feature of the decree.

### Incorporation of Findings in the Decree.

[11] I have already considered this question, but the plaintiff is very insistent that some disposition should be made of the exceptions. In Oliver v. Piatt, 3 How. 333, 11 L. Ed. 622, the decree did not dispose of the exceptions, and Justice Story ignored the defect. In Kelsey v. Hobby, 16 Pet. 269, 276, 10 L. Ed. 961, the court held that, where the matter was not of an exact sum due and all the evidence was in the record, it was not improper to confirm the report as a whole. A distinction should be drawn between the case at bar and one like Kimberly v. Arms, 129 U. S. 512, 523–525, 9 Sup. Ct. 355, 32 L. Ed. 764, where the reference was of all the issues on consent and to hear and determine, when the findings are well-nigh conclusive. In the case at bar the reference was not on consent—though without

objection—and it was only advisory in any case.[4]  In such cases "the report has no legal sanction, and no further weight than such as at-taches to it by reason of the fact that it may embody the researches and conclusions of an intelligent master."  Street, Fed. Eq. Prac. § 1516.  It is therefore really of no consequence to dispose of the ex-ceptions for these reasons, and quite independently of the fact that this is a rate case.

However, the point is doubtful, and rather than leave it open to any difficulty on appeal I have in the amended decree confirmed specifi-cally all those findings which I mean to confirm, and have declared that the other parts of the report are to be deemed superseded by my opinion.  This can leave no doubt whatever as to what parts of the report I mean to stand.  Unless I were to make findings in the de-claratory part of the decree, which is never necessary (Street, Op. Cit. § 1964), I could not do more than refer to the opinion, which I have done.

I would not be understood to disagree with the master in so far as I have not confirmed his report.  Our difference resulted from the fact that I bore much more heavily than he against the plaintiff.  This might not have been a feasible disposition of the case, had the result been more doubtful.  I have generally, though not always, felt justi-fied in making conclusions not based upon the actual facts, but upon the least allowance which could fairly be taken for the various items. Obviously a difference between my results and the master's does not indicate that I should not agree with him, but only that I followed a different plan in dealing with the case.  As it is always proper for the court to make its own findings (Henderson, Chancery Practice, 487), it becomes unnecessary to do more.  As now drawn, I think the decree is certainly open to no procedural challenge.

## Stay Pending Appeal.

I have introduced the provision suggested by the plaintiff in the stay.  Perhaps it is not important, but it may help expedite the appeal. I file herewith an amended decree and an amended stay.

---

[4] The order read that the special master was "to take all of the testimony and evidence respecting the issues herein, make all needed computations, and fully find the facts; but nothing herein contained shall be construed as meaning that the special master's findings of fact shall be final, but only that he shall find the facts for the purpose of aiding the court and making his recommendations."